2010 UT 1

**STATE of Utah, Plaintiff and Appellee,**

v.

**Mark Anthony OTT, Defendant and Appellant.**

No. 20040638.

Supreme Court of Utah.

Jan. 5, 2010.

Rehearing Denied June 11, 2010.

Mark L. Shurtleff, Att'y Gen., Laura B. DuPaix, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Elizabeth Hunt, Salt Lake City, for defendant.

NEHRING, Justice:

## INTRODUCTION

¶ 1 This case comes to us on direct appeal from Mark Ott's sentencing for aggravated murder and other charges. On one horrific night in the summer of 2002, Mr. Ott broke into the home of his wife, Donna Ott, who had recently filed for divorce. Knife in hand, Mr. Ott attacked Mrs. Ott's boyfriend, Allen Lawrence. He also stabbed his stepdaughter, Sarah Gooch. Mr. Ott then set the house on fire. All of the residents of the house escaped except Lacey Lawrence, Mr. Lawrence's six-year-old daughter, who died in the fire. Mr. Ott eventually entered an *Alford* plea of guilty to aggravated murder in connection with Lacey's death and pled guilty to other charges. He was sentenced by a jury to life in prison without the possibility of parole. In Mr. Ott's direct appeal, he argues over the legality of his plea as well as various instances of ineffective assistance. We hold that Mr. Ott's counsel provided ineffective assistance because counsel failed to object to portions of the victim impact evidence.

## BACKGROUND

¶ 2 Mr. Ott married Donna Ott in 1996. Mrs. Ott had three children from a previous marriage (Daniel, Sarah, and Lucy), and had two more after her marriage to Mr. Ott (Carissa and William). Over the years, marital and family problems increased, and Mrs. Ott eventually separated from Mr. Ott and filed for divorce. A month after their separation, Mrs. Ott met Allen Lawrence and they began to date. Mr. Ott disapproved of Mrs. Ott's relationship with Mr. Lawrence

and verbally and physically threatened the two of them on several occasions.

¶ 3 On the night of the fire, Mrs. Ott was awakened by her dogs barking. She went to the window to check on them and saw Mr. Ott in the backyard. She then ran to Mr. Lawrence, who was asleep in her bed, and attempted to wake him. Meanwhile, Mr. Ott broke into the house, entered Mrs. Ott's bedroom, and began to stab Mr. Lawrence. Mrs. Ott's daughter, Sarah, attempted to stop Mr. Ott from stabbing Mr. Lawrence by jumping on Mr. Ott's back and hitting his head with a can of mace. Mr. Ott then stabbed Sarah in her abdomen. During the attack, Mrs. Ott attempted to call the police but was unsuccessful because the phone line had been cut.

¶ 4 Despite his wounds, Mr. Lawrence was able to escape the bedroom and make his way to the front door. Mr. Ott followed Mr. Lawrence and continued to stab him. At some point, the knife broke and Mr. Ott was distracted by Mrs. Ott who had been watching the attack from the hallway. Mr. Ott said to Mrs. Ott, "Now look what you've made me do. Are you happy now?" He then approached Mrs. Ott and embraced her from behind. At that point, Lucy came upstairs from her bedroom in the basement, saw Mr. Ott, screamed, and ran back downstairs. Then, either while Mr. Ott held Mrs. Ott or shortly after, Sarah came from the bedroom and helped Mr. Lawrence out the front door. Sarah and Mr. Lawrence ran down the street and hid behind a fence.

¶ 5 Meanwhile, Mr. Ott went out the back door. Mr. Ott re-entered the home and poured gasoline, which he had obtained from the garage, on Mrs. Ott's bed. Mr. Ott then went downstairs, lit a sofa and a loveseat on fire, and told Mrs. Ott to get everyone out of the house. Seeing the fire, Mrs. Ott yelled for her daughter, Lucy, and Lucy's friend, Hillary, who was spending the night. She found the girls in the basement, and they safely exited the house. Mrs. Ott confirmed that her children were safely out of the house by conducting a head count, but she forgot to confirm the whereabouts of Lacey.[1] Lacey was Mr. Lawrence's six-year-old daughter, and she was spending the night in Carissa's room on the main floor of the house. Mrs. Ott then observed Mr. Ott leaving the scene in her vehicle.

¶ 6 Just as Mr. Ott drove away, Mrs. Ott remembered that Lacey was still in the house. She ran back to the burning house and attempted to enter it, but was prevented from doing so by a police officer. Firefighters found Lacey inside a bedroom, dead from carbon monoxide poisoning.

¶ 7 Mr. Ott was charged with aggravated murder as a capital felony. The State also charged him with aggravated arson, aggravated burglary, aggravated assault, theft, attempted aggravated murder, and violation of a protective order. Mr. Ott maintained that he never knew Lacey was in the house, though he admitted starting the fire that killed her. Mr. Ott moved to quash his bindover on the charge of aggravated murder. He argued that he could not have intentionally and knowingly killed Lacey because he did not know she was in the house. Mr. Ott further argued that his intent to kill Mr. Lawrence with a knife was different from his intent to burn the house down.

¶ 8 The State argued that transferred intent and concurrent intent, also known as the "kill zone" theory, sufficed to sustain charges of aggravated murder. The district court rejected as too tenuous the State's theory that Mr. Ott's intent to kill Mr. Lawrence could be transferred and treated as the intent to kill Lacey. Nevertheless, the district court held that the magistrate, in ordering the bindover, had implicitly found that Mr. Ott harbored an intent to kill Mrs. Ott in the fire and that this intent transferred to Lacey.

¶ 9 Mr. Ott petitioned unsuccessfully for interlocutory review of the district court's order. A plea bargain was arranged, and Mr. Ott entered an *Alford* plea[2] to the ag-

---

1. Daniel had moved out of the house, and William and Carissa were spending the night at Mr. Ott's home.

2. By entering an *Alford* plea, a defendant does not admit guilt. Rather, the defendant enters a guilty plea because he recognizes that a prosecutor has enough evidence to obtain a guilty verdict. In *North Carolina v. Alford*, Mr. Alford

gravated murder charge and guilty pleas to the other charges in exchange for the State's agreement not to pursue the death penalty in his capital sentencing hearing and to drop several charges.

¶ 10 At the capital sentencing hearing, the jurors heard testimony from various individuals. Ten of the twelve jurors voted to sentence Mr. Ott to life in prison without the possibility of parole. The district court then imposed the statutory prison terms for each of the other charges and ordered them to run consecutively to each other and to the life without parole sentence.

¶ 11 Mr. Ott's case next came to us on direct appeal where the central issue was Mr. Ott's claim that his attorneys were ineffective. We ordered that the case be temporarily remanded to the district court for discovery pursuant to rule 23B of the Utah Rules of Appellate Procedure. At the conclusion of the hearings, the district court entered findings that no conflict of interest existed and that Mr. Ott's counsel was not ineffective. The record was returned to us for final action on Mr. Ott's direct appeal.

¶ 12 After hearing oral arguments and reviewing the parties' briefs and the record, we asked for supplemental briefing on the issue of whether Mr. Ott's *Alford* plea to aggravated murder could satisfy the elements of Utah Code section 76-5-202 (2008). We were concerned that Mr. Ott's *Alford* plea was defective as a matter of law because of the statutory requirement that to be guilty of aggravated murder a defendant must knowingly and intentionally kill the victim.

¶ 13 This appeal will address (1) whether Mr. Ott's plea was defective as a matter of law and (2) whether Mr. Ott's representation constitutes ineffective assistance of counsel. Because we hold that "Mr. Ott's counsel was

objectively deficient for failing to object to portions of the victim impact evidence introduced by the prosecution, and that this failure prejudiced Mr. Ott, we do not address the rest of Mr. Ott's ineffective assistance claims. *See State v. Carter,* 776 P.2d 886, 889 (Utah 1989) (overruled on other grounds) (noting court's ability "to expeditiously focus judicial resources and energy on those critical or outcome-determinative issues which may be raised in any given case and/or which have not in substance been previously urged upon this Court and rejected"). We have jurisdiction over this appeal pursuant to Utah Code section 78A-3-102(3)(j) (2008).

## STANDARD OF REVIEW

¶ 14 We will address the following two issues on appeal: (1) whether Mr. Ott's guilty plea was proper and (2) whether Mr. Ott's counsel was ineffective.

¶ 15 First, attempts to withdraw a guilty plea invite multiple standards of review. *State v. Beckstead,* 2006 UT 42, ¶ 7, 140 P.3d 1288. As an initial matter, we note "an attempt to withdraw a guilty plea on appeal must be preceded by a motion before the district court." *State v. Rhinehart,* 2007 UT 61, ¶ 2, 167 P.3d 1046.

¶ 16 Second, some of Mr. Ott's claims of ineffective assistance of counsel are raised for the first time on appeal and some have been addressed by the trial court in the 23B hearing, both categories bearing different standards of review. Mr. Ott's ineffective assistance claim relating to counsels' failure to object to the victim impact evidence was not a part of his 23B hearing. Because we decide this case on a claim of ineffective assistance of counsel that is presented for the first time on appeal, we need only describe one appropriate standard of review. "An

---

argued that he was innocent of the murder charge but pled guilty to second degree murder in an attempt to avoid the threat of a sentence of death for first degree murder. 400 U.S. 25, 28, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The United States Supreme Court stated that "while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty." *Id.* at 37, 91 S.Ct. 160. The Court went on to hold that "[a]n

individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* The Court concluded that this type of plea would be appropriate when "a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *Id.*

ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

## ANALYSIS

### I. THIS COURT LACKS JURISDICTION TO ADDRESS MR. OTT'S GUILTY PLEA BECAUSE MR. OTT FAILED TO MOVE THE COURT TO WITHDRAW HIS PLEA

 ¶ 17 Utah Code section 77–13–6 (2008) governs the withdrawal of guilty pleas, including the *Alford* plea in Mr. Ott's case. Section 77–13–6 states:

(1) A plea of not guilty may be withdrawn at any time prior to conviction.

(2)(a) A plea of guilty or no contest may be withdrawn only upon leave of the court and a showing that it was not knowingly and voluntarily made.

(b) A request to withdraw a plea of guilty or no contest, except for a plea held in abeyance, shall be made by motion before sentence is announced. Sentence may not be announced unless the motion is denied. For a plea held in abeyance, a motion to withdraw the plea shall be made within 30 days of pleading guilty or no contest.

(c) Any challenge to a guilty plea not made within the time period specified in Subsection (2)(b) shall be pursued under Title 78B, Chapter 9, Post–Conviction Remedies Act, and Rule 65C, Utah Rules of Civil Procedure.

 ¶ 18 We have previously held that failure to withdraw a guilty plea within the time frame dictated by section 77–13–6 deprives the trial court and appellate courts of jurisdiction to review the validity of the plea. *State v. Rhinehart*, 2007 UT 61, ¶¶ 12–14, 167 P.3d 1046; *see also Grimmett v. State*, 2007 UT 11, ¶ 8, 152 P.3d 306 ("Utah Code section 77–13–6(2)(b) establishes the filing limitations that govern a criminal defendant's right to withdraw a guilty plea. These filing limitations are jurisdictional.") "Section 77–13–6(2)(b) 'imposes a jurisdictional bar on late-filed motions to withdraw guilty pleas,' and failure to comply with its requirements 'ex-

tinguishes a defendant's right to challenge the validity of the guilty plea on appeal.'" *Grimmett*, 2007 UT 11, ¶ 8, 152 P.3d 306 (internal quotation marks and citations omitted); *State v. Merrill*, 2005 UT 34, ¶¶ 13–20, 114 P.3d 585 (addressing jurisdictional nature of section 77–13–6(2)(b) prior to significant 2003 amendment). In *Rhinehart*, we further held that a defendant may not overcome a failure to timely withdraw his guilty plea even if the failure is "styled as a claim of ineffective assistance of counsel." 2007 UT 61, ¶ 14, 167 P.3d 1046.

 ¶ 19 Mr. Ott did not move to withdraw his guilty plea within the time restrictions of section 77–13–6. He argues that this court should disregard his failure to timely move to withdraw his guilty plea because his guilty plea constitutes a misplea. We stated in *State v. Kay* that a misplea may be granted

where obvious reversible error has been committed in connection with the terms or the acceptance of the plea agreement and no undue prejudice to the defendant is apparent[,] . . . . in situations where some fraud or deception by one party leads to the acceptance of the plea agreement[,] . . . . [and] other circumstances where the balancing of the interests and legitimate expectations of the defendant and the public.

717 P.2d 1294, 1305 (Utah 1986), *overruled on other grounds by State v. Hoff*, 814 P.2d 1119, 1123 (Utah 1991). Obvious reversible error occurs when manifest necessity is present. *Id.* at 1303.

¶ 20 We decline to discuss whether Mr. Ott's plea met the requirements for a court to grant a misplea because we hold that the misplea doctrine in Mr. Ott's case cannot be used to circumvent jurisdictional requirements. Furthermore, neither the State nor Mr. Ott made any motion to the trial court that a misplea occurred, a factor which is considered in cases that have granted a misplea. *See Id.* at 1296–97; *State v. Lopez*, 2005 UT App 496, ¶¶ 2–8, 14–27, 128 P.3d 1; *State v. Bernert*, 2004 UT App 321, ¶¶ 2–5, 7–12, 100 P.3d 221; *State v. Horrocks*, 2001 UT App 4, ¶¶ 2–7, 12–32, 17 P.3d 1145; *State v.*

*Moss*, 921 P.2d 1021, 1022–27 (Utah Ct.App. 1996). The Utah Court of Appeals has recognized that a trial court may sua sponte set aside a guilty plea even after the time restrictions of section 77–13–6 have expired. *Lopez*, 2005 UT App 496, ¶ 19, 128 P.3d 1. In this case, however, the trial court never exercised this discretion. Moreover, unlike the circumstance here, sentencing had not yet occurred in *Lopez*. We therefore do not have jurisdiction to determine the validity of Mr. Ott's guilty plea.

## II. MR. OTT'S COUNSEL WAS INEFFECTIVE BECAUSE HE FAILED TO OBJECT TO VICTIM IMPACT EVIDENCE, THEREBY PREJUDICING MR. OTT

¶ 21 Mr. Ott argues his trial counsel was ineffective because counsel failed to object to the admission of certain victim impact evidence during his capital sentencing hearing. Specifically, counsel did not challenge the admissibility of a six-minute videotape featuring pictures of Lacey Lawrence set to moving music, testimony from Lacey's family members about the devastating effect Lacey's death had on them, and testimony from Lacey's family on their opinion of Mr. Ott's character and the appropriate sentence.

¶ 22 "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. "To prove ineffective assistance of counsel, defendant must show: (1) that counsel's performance was objectively deficient and (2) a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *Id.* "To satisfy the first part of the test, defendant must overcome the 'strong presumption that [his] trial counsel rendered adequate assistance.'" *Id.* (quoting *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996)) (alterations in original).

¶ 23 In *State v. Carter*, we questioned whether victim impact evidence concerning a defendant's blameworthiness was probative and held that victim impact evidence was inadmissible in capital sentencing. 888 P.2d 629, 652–53 (Utah 1995), *superseded by statute*, Utah Code Ann. § 76–3–207(2)(a)(iii) (1995) ("This censure of victim impact evidence in capital cases applies to evidence of the victim's character, evidence of the effects of the crime on the surviving members of the family, and evidence of the surviving members' opinions of the crime."). In 1995, the Legislature amended section 76–3–207 to expressly allow evidence pertaining to "the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims," in capital sentencing proceedings. Utah Code Ann. § 76–3–207(2)(a)(iii) (2008).

¶ 24 Mr. Ott argues that regardless of the amendment to section 76–3–207, his trial counsel should have argued that the victim impact evidence presented by the State in his sentencing proceeding was not admissible either because (1) section 76–3–207(2)(a)(iii) is unconstitutional under the Utah Constitution, or (2) that under *Carter* the evidence is inadmissible because it is not probative. Mr. Ott also contends that his counsel provided ineffective assistance for failing to object to portions of the victim impact evidence that spoke to Mr. Ott's character, chances for his rehabilitation, and the appropriate penalty to be imposed; all of which he insists violated the United States Constitution. We do not address Mr. Ott's first two arguments today because we hold that portions of the impact evidence the State introduced at Mr. Ott's sentencing hearing violated the Eighth Amendment of the United States Constitution, and that Mr. Ott's counsels' failure to object to this evidence constitutes ineffective assistance of counsel.[3]

---

3. Mr. Ott has cited various provisions of the Utah Constitution as possibly standing for the proposition that Utah Code section 76–3–207(2)(a)(iii) is unconstitutional. In the past we have declined to address the constitutionality of section 76–3–207(2)(a)(iii) because either the issue had not been briefed or admission of the victim impact evidence constituted harmless error. *See State v. Arguelles*, 2003 UT 1, ¶ 123 n. 26, 63 P.3d 731; *State v. Honie*, 2002 UT 4, ¶ 61 n. 7, 57 P.3d 977; *State v. Kell*, 2002 UT 106, ¶¶ 52–54, 61 P.3d 1019. In Mr. Ott's case, we decline to address the constitutionality of section 76–3–207(2)(a)(iii). We also do not address whether

*A. Mr. Ott's Counsel Was Objectively Deficient Because They Failed to Object or to Attempt to Otherwise Exclude Portions of the Victim Impact Evidence*

¶ 25 "To establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the basis of the law in effect at the time of trial, his or her trial counsel's performance was deficient." *State v. Dunn,* 850 P.2d 1201, 1228 (Utah 1993). In *Payne v. Tennessee,* the United States Supreme Court held that the Eighth Amendment does not bar, per se, victim impact evidence, but victim impact evidence may be inadmissible if the evidence is so prejudicial that it makes sentencing fundamentally unfair under the Due Process Clause. 501 U.S. 808, 823, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *see also Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))). *Payne* overturned *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which held the Eighth Amendment barred victim impact evidence. *Payne,* 501 U.S. at 830, 111 S.Ct. 2597. However, to the extent *Payne* overruled *Booth, Booth* retained viability for its holding that victim impact evidence that addresses the defendant's character or expresses the victim's opinion of the appropriate sentence at the penalty phase of trial is inadmissible under the Eighth Amendment. *Id.* at 830, n. 2, 111 S.Ct. 2597 (stating, *Payne* is limited to holding "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing"); *see also id.*

at 833, 111 S.Ct. 2597 (O'Connor, J. concurring) (stating, "we do not reach this issue as no evidence of this kind was introduced at petitioner's trial"); *United States v. McVeigh,* 153 F.3d 1166, 1217 (10th Cir.1998) (stating, "*Payne* did not overrule the prohibitions in *Booth* against the admission of 'information concerning a victim's family members' characterization of and opinions about the crime, the defendant, and the appropriate sentence.'" (quoting *Payne,* 501 U.S. at 835 n. 1, 111 S.Ct. 2597 (Souter, J., concurring))).

¶ 26 We hold that large portions of the victim impact evidence introduced at Mr. Ott's capital sentencing hearing featured the victims' opinions of the defendant's character or the appropriate sentence and were therefore clearly at odds with United States Supreme Court precedent. Each victim was asked to testify about how he or she would feel if Mr. Ott were to be released in twenty years. Each expressed the opinion that Mr. Ott could not be rehabilitated and the notion that he might ever be released frightened them. We recount the relevant testimony below. In order to provide context for the statements made, we have quoted large portions of the testimony given at Mr. Ott's sentencing hearing. Although this testimony contains many impermissible statements, we are not suggesting that every statement quoted below is constitutionally inadmissible.

¶ 27 Allen Lawrence, Lacey's father, testified as follows:

Q. In giving you an opportunity at this point to express your thoughts and feelings to the jury about what you think they ought to consider in imposing sentence on Mr. Ott, what would you say?

A. Well, I think they need to take what kind of guy this person is into consideration. I mean, he's shown his hand. He's shown what he truly is, the kind of man he

Mr. Ott's counsel was objectively deficient for failing to object to the "Meet Lacey Lawrence" video. This court follows the primacy approach and "looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive." *West v. Thomson Newspapers,* 872 P.2d 999, 1006 (Utah 1994) (internal quotation marks omitted). We do not address the state constitutional issues briefed by Mr. Ott be-

cause doing so may require us to find section 76–3–207(2)(a)(iii) unconstitutional. Avoiding such an outcome is an adequate reason to stray from the primacy approach in this case. *See State v. Briggs,* 2008 UT 83, ¶ 26, 199 P.3d 935 ("[I]f the challenged state action violates the federal Constitution, we need not reach the question of whether the Utah Constitution provides additional protection; we may instead resolve the case with reference only to the federal Constitution.")

is ... these types of crimes are committed by certain types of people and he just happens to be one of them. They are psychopathic in nature. They have no feelings for other people. They have no respect for other people's rights. No respect for other people's pursuit of happiness. No respect for other people's feelings. They can kill and they don't have any more feeling for killing someone than if they reached up and picked an apple off of a tree. They don't feel it. That's the kind of guy this is. I don't think he'll ever change. I don't think he should ever have the opportunity to again perpetrate his violent nature on any human being anywhere again ever. He doesn't deserve it. He's used up all his chances. He's shown who he is and what he does when he does not get his way. He's shown us. He showed his hand. That's what he is. That's is [sic] the defining moment of that man's life. That five minute episode defined him as what he is. That's what Mr. Ott is. That's him.

Q. Based upon your personal experiences with Mr. Ott ... and what you observed and perceived in the manner and fashion in which he carried out the attack on you on Hawthorne Drive, is it your perception that if he had known Lacey was in that house would he have escorted her out before setting that house on fire?

A. I don't think he would have done a damn thing different. This man is a terrorist. He deals with anarchist cookbooks. He looks at how bombs are built. When he set that house on fire this isn't like building a campfire with a grocery sack. This is a bomb. If I dumped gallons of gasoline on this floor right here and lit it with a match, can you imagine how explosive that would be? It goes up instantly. I've thrown little bits of gas on a campfire to start one. It flares up instantly. Can you imagine that much gasoline in the house? ... He didn't care. This guy does not care about other people's feelings. He has no empathy for anybody, none. He doesn't have it. It's not inside of his character to have that.

¶ 28 Donna Ott testified as follows:

Q. Assuming that Mr. Ott was given a sentence of life with possibility of parole, do you have any concerns about him getting out of prison?

A. I think I should. As a matter of fact, I do.

Q. Okay. What is that concern?

A. I know a lot of very healthy 60–year–old men. I don't see that things will change much in 20 years. I believe that he'll come out and he will look for us. Knock. Knock. Exactly right.

Q. So do you feel like he'd do this to you again?

A. Exactly. Yes. Yes.

Q. You said that you don't see him changing. What is that based on?

A. The control freak. They don't know—if they don't get what they want, they don't know any other way but to threaten. It's a lifestyle. He doesn't know how to deal—it's how he lives his life.

¶ 29 Sarah Gooch, Donna Ott's daughter, responded to a similar line of questioning as follows:

Q. Based upon your—your knowledge having lived with Mark Ott for those years, experienced life in the home with Mark Ott, and experienced the attack on September 1st of 2002 by Mark Ott, what if any concerns do you have if Mark Ott is ever released from prison?

A. I have a hard enough time sleeping as it is. It's a long time for somebody to stir about how pissed off they are.

Q. What about his ability to change in prison based upon what you know of him?

A. Mark's been like—his whole life, ever since I've known him. How is he gonna change?

Q. How will that impact you personally, do you believe, if he's ever released from the Utah State Prison?

A. I don't know. I—I don't know. I'm terrified now. I'd hate to see how scared I'd be if he was actually out.

¶ 30 Lucy Gooch testified:

Q. After the event of that night, what you've done, what you've gone through

since, do you have any—are you fearful of the defendant?

A. Very much so.

Q. And do you have any fear if he would be released from prison in 20 years or what he might do?

A. I think that if we let him out, it doesn't matter how old he's going to be, I think that, you know, he'll finish what he went there to do. I honest to God I [sic] feel that way.

¶ 31 Amber Lawrence, Lacey's sister, testified as follows:

Q. Amber, knowing what happened in the home on September 1st of 2002, in the Out [sic] Home, and what happened to your little sister, what are your thoughts and feelings on how it would make you feel knowing that the man that did this to your father and sister might have the possibility of being released from prison in 20–plus years.

A. Terrifies me. I don't think that it— he wouldn't—he wouldn't change. He wouldn't change at all. And I didn't—I came here not knowing about not even a portion of the things that have went on in the jail, things that he had done. But I mean, it scares me enough just sitting in this courtroom with him knowing he has no handcuffs on. That scares me enough. And I don't even want to think about how it would be knowing he was going to get out in any amount of time. I don't see how anybody could do what he did. But he did that today. And I know that if it was up to him, my dad wouldn't be sitting here today. My dad would not be here at all ... But it could have very well been me instead of my little sister, or both of us.

Q. Amber, is there anything else you want this jury to know? Any other thoughts or feelings you have you want to make sure they are—

A. I want them to know that Mark does not care. He doesn't care what happened that night. He doesn't care if it was me or my sister or everybody in that house. He burned it down. He didn't help anybody out of it. He didn't try to pick out one person out of five. He wanted just for us, my dad. He was there for whoever and whatever was in that house. I mean, the house could have caught on fire to the next door neighbors. He didn't care who died. He didn't care who got hurt. I know his intention was to kill my dad, but instead he killed my little sister. And I don't think he deserves anything more than what she got. She can't be here today to say what she thinks. I don't think that he deserves any rights. He shouldn't have any rights. He took all of hers away from her, and I don't believe that he should have any.

¶ 32 Terry Cook, Lacey Lawrence's mother, testified as follows:

Q. ... Do you have any feelings that you would like to express as they relate to the defendant and what should happen to the defendant?

A. Yeah. I think he should have to walk in my shoes. I think you should have to walk in my shoes 'cause my last two years have been horrible. You know what? They are not going to get better. I loved my daughter. The love I had for my daughter was so strong. You can't take that away ... and I hate to say this, but I hope you don't get out on parole because you don't deserve it. My daughter don't get to come back to me right now. I didn't get to finish with my daughter's life. I have to go home tonight without my daughter there, and I have to be alone for the rest of my life and be unhappy for the rest of my life. I hope you can think about that for the rest of your life.

¶ 33 It is clear to us that the testimony offered at Mr. Ott's sentencing falls squarely within the categories of evidence identified as inadmissible, in capital sentencing hearings, by *Payne* and *Booth*. Mr. Ott's counsel was objectively deficient for failing to object to the offensive evidence.

▮▮▮▮▮▮ ¶ 34 The State argues, however, that Mr. Ott's counsel deliberately chose not to object to the inadmissible evidence as part of trial strategy. We find this argument to be without merit. "Proving that his counsel's performance fell below an objective standard of reasonableness requires [Mr. Ott] to 'rebut the strong presumption that under the cir-

cumstances, the challenged action might be considered sound trial strategy.' " *Taylor v. State,* 2007 UT 12, ¶ 73, 156 P.3d 739 (quoting *Carter v. Galetka,* 2001 UT 96, ¶ 40, 44 P.3d 626). We " 'will not review counsel's tactical decisions simply because another lawyer, e.g., appellate counsel, would have taken a different course.' " *Parsons v. Barnes,* 871 P.2d 516, 524 (Utah 1994) (quoting *State v. Jones,* 823 P.2d 1059, 1063 (Utah 1991)). Additionally, "whenever there is 'a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel.' " *Id.* (quoting *State v. Bullock,* 791 P.2d 155, 160 (Utah 1989)). In essence, the question is "[w]as the failure to raise the objections before the trial court the result of a consciously chosen strategy of trial counsel rather than an oversight, and if it was a strategic decision, did the making of that choice constitute ineffective assistance of counsel?" *Bullock,* 791 P.2d at 158–59.

¶ 35 We have previously analyzed whether trial counsels' failure to object to victim testimony at trial is merely trial strategy. *Id.* at 155. In *Bullock,* a child sexual abuse case, the defendant argued his trial counsel was ineffective in failing to argue that videotaped testimony of alleged child abuse victims and expert testimony was inadmissible. *Id.* At trial, videotaped testimony of four boys describing the alleged abuse was presented to the jury, and the social worker to whom the boys first disclosed the abuse was questioned at trial. *Id.* at 156. Among other things, defense counsel did not object to the admissibility of the out-of-court statements, the videotaping procedures, or the expert witness's testimony that the children were victims of sexual abuse. *Id.* at 157–58.

¶ 36 We found that allowing the jury to hear the videotaped descriptions and the expert testimony and then cross-examining the expert to attack the credibility of the children's accusations was defense counsels' strategy. *Id.* at 160. Defense counsel attempted to "attack the quality of the State's evidence in an effort to persuade the jury of the insufficiency of the evidence to support a conviction." *Id.* at 158. We held that coun-

sel in *Bullock* was not objectively deficient because "[w]hile the evidence complained of may have been inadmissible, trial counsel could reasonably conclude under these circumstances that there was little chance of keeping the testimony of the children out of evidence," and that it was necessary to allow the expert testimony of the social worker in order for defense counsel to challenge the veracity of the expert's techniques. *Id.* at 159. We also took into account that defense counsels' presentation of defense experts and evidence of defendant's good character and reputation for truthfulness was consistent with a rational defense strategy. *Id.* at 158.

¶ 37 Mr. Ott's counsels' failure to object to the victim impact evidence presented in this case cannot be construed to be a component of any rational defense strategy. The State presents us with what it views as one defense strategy that would include tolerating the admission of prejudicial and inflammatory inadmissible evidence: one that employed as its central features avoiding the perception that Mr. Ott was "pushing Lacey aside" while presenting Mr. Ott as a remorseful man who took responsibility for his actions. The State argues that any objection made to the victim impact evidence would minimize the effect of this strategy.

¶ 38 We conclude, however, that counsels' overall strategy was not just to avoid dishonoring Lacey's death, but also to present Mr. Ott as someone who could be rehabilitated and who deserved the possibility of parole. In *State v. Hovater,* we noted if "the evidence ha[s] no conceivable beneficial value to [the defendant], the failure to object to it cannot be excused as trial strategy." 914 P.2d 37, 42 (Utah 1996). Victim impact testimony that portrayed Mr. Ott as a murderer who was motivated by a desire to terrorize his victims and who is beyond rehabilitation does not conceivably support Mr. Ott's defense under the State's theory or any other that could be rationally constructed.

¶ 39 We note that avoidance of drawing the jury's attention to certain facts or over-emphasizing aspects of the facts is a well recognized trial strategy. *See State v. Harter,* 2007 UT App 5, ¶ 16, 155 P.3d 116 (finding strategic decision in failure of de-

fense counsel to argue for curative jury instruction on implication of defendant's flight because defense counsel did not want to emphasize the fact that defendant fled the scene of the crime). In Mr. Ott's case, however, tactical methods were available to his counsel, which could have limited the type of victim impact evidence admitted. For instance, Mr. Ott's counsel could have sought exclusion of the victim impact evidence about Mr. Ott's character through a motion in limine. A decision not to object to the victim impact evidence, especially when the evidence violated existing precedent prohibiting victims expressing opinions about the sentence or the defendant's character, falls below the line of objective reason and therefore amounts to ineffective assistance of counsel.

### B. Mr. Ott's Objectively Deficient Representation Prejudiced Mr. Ott

¶ 40 We also hold that Mr. Ott's objectively deficient representation prejudiced him. A defendant "is prejudiced by counsel's actions only if the result of the proceedings would have been different absent the claimed deficiency." *State v. Greuber,* 2007 UT 50, ¶ 9, 165 P.3d 1185. "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving that counsel's errors 'actually had an adverse effect on the defense' and that 'there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different.' " *State v. Santana–Ruiz,* 2007 UT 34, ¶ 20, 2007 WL 1095559 (quoting *Strickland v. Washington,* 466 U.S. 668, 693–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Taylor v. State,* 2007 UT 12, ¶ 56, 156 P.3d 739 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). "Because' [s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have

had an isolated trivial effect,' in determining the effect of the error, we 'consider the totality of the evidence before the . . . jury.' " *State v. Hales,* 2007 UT 14, ¶ 86, 152 P.3d 321 (alterations in original) (quoting *Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052).

¶ 41 In this case, the record discloses that there is a reasonable probability that but for the admission of the victim impact evidence that addressed Mr. Ott's character and the victims' opinions of the appropriate sentence, Mr. Ott would have received a more favorable sentence. The admission of the evidence sufficiently undermines our confidence in Mr. Ott's sentence.

¶ 42 In *State v. Kell,* we analyzed the prejudicial effect of victim impact evidence. 2002 UT 106, ¶¶ 52–54, 61 P.3d 1019.[4] Mr. Kell, already incarcerated for murder, was charged with the aggravated murder of Mr. Blackmon, another inmate, and Mr. Kell was convicted and sentenced to death. *Id.* ¶¶ 1–2. At the guilt phase of the trial, the victim's family testified about the pain, devastation, and anguish the loss of the victim had caused them. *Id.* ¶ 52 n. 15. We concluded that the victim impact evidence in Mr. Kell's case was not prejudicial. In making that determination, we emphasized that the family's victim impact testimony was "[not] particularly inflammatory," "moderate in tone, descriptive of the family's loss and mourning but not militant or angry," and made "no effort to pressure the jury to impose the death penalty." *Id.* ¶¶ 53–54. Specifically, a statement prepared by the victim's family and read to the court stated:

> Concerning the penalty phase for this individual, the family has an abiding conviction that man's laws were written for the unjust and for evildoers. Therefore whatever punishment is meted out by this Court or this jury, whether it be the death penalty or some other sentence, my family will accept that ruling.

*Id.* ¶ 52 n. 15.

¶ 43 In concluding that the admission of the victim impact evidence did not prejudice

---

**4.** The prejudice of victim impact evidence in *Kell* was addressed under the prejudice prong of a plain error analysis. We have previously held, however, that a prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework. *State v. Parker,* 2000 UT 51, ¶ 10, 4 P.3d 778 ("The prejudice test for ineffective assistance of counsel claims is equivalent to the harmfulness test applied in assessing plain error.").

the defendant, and therefore did not undermine our confidence in the outcome, we found it important to note that the victims' statements "did not ask for the death penalty, but left the decision up to the jury in remarkably neutral terms." *Id.* ¶ 53. In dicta, we also suggested that our inquiry might have been different had the victim impact evidence been introduced in the penalty phase of the trial. *Id.* ¶ 54 ("Absent [the presence of the victim impact evidence] in the penalty phase, we see no possibility that the jury's verdict would have been different.").

¶ 44 The content of victim impact testimony in Mr. Ott's case is dramatically more inflammatory than the evidence admitted in *Kell.* Here, the testimony was angry in tone, inflammatory in content and contained messages that Mr. Ott was beyond rehabilitation. Additionally, the victim impact evidence was admitted during the penalty phase of the trial and comprised a large portion of the total evidence presented. The existence of these factors, especially considering that Mr. Ott's counsel never uttered a word objecting to the admission of the evidence, undermines our confidence in the outcome.

¶ 45 The State argues mitigation evidence presented by Mr. Ott's counsel ameliorates any prejudicial or inflammatory effect the victim impact evidence had. Our caselaw addressing prejudice under *Strickland* suggests that deficient counsel that leads to the admission of inflammatory statements is not prejudicial if other mitigating statements or evidence is presented. For instance, in *State v. Dunn* we held that a defendant was not prejudiced by his counsels' failure to request a jury instruction concerning uncorroborated witness testimony because the county attorney had testified that the witness's testimony was given in exchange for a reduction in his own charge, the witness admitted on the stand to be a pathological liar, and the judge instructed the jury that they may disregard evidence they deemed incredible. 850 P.2d 1201, 1226–28 (Utah 1993). The ameliorating statements mitigated any prejudicial effect the absence of an uncorroborated witness jury instruction may have had on the outcome of Mr. Dunn's trial. *Id.*

¶ 46 Mr. Ott's case does not present an instance where the mitigating evidence presented negates the prejudicial effect of the unlawful victim impact evidence. The single question before the jury was whether Mr. Ott should receive a sentence of life with parole or life without parole. Implicit in a sentence of life with the possibility of parole is a belief by the jury that Mr. Ott could one day be rehabilitated and re-enter society. Underlying the jury's decision is the large amount of evidence addressing Mr. Ott's mental health, including any mood or personality disorders.

¶ 47 Dr. Egli, the prison psychiatrist who treated Mr. Ott, testified that Mr. Ott was responding positively to medication. Mr. Ott's counsel also presented evidence of Mr. Ott's tumultuous childhood, war experience, and numerous psychiatric hospital stays leading up to the night of the crime wherein he may have been improperly medicated. While persuasive, this evidence does not, in our judgment, neutralize in any meaningful way the prejudicial effect that the characterization of Mr. Ott as a murdering "terrorist" made by people who directly encountered Mr. Ott on the night of the crime. That he was improving while medicated in prison did nothing to mitigate the numerous statements made that, once released, Mr. Ott would become uncontrollable. In considering " 'the totality of the evidence before the ... jury,' " *Hales,* 2007 UT 14, ¶ 86, 152 P.3d 321 (quoting *Strickland,* 466 U.S. at 695–96, 104 S.Ct. 2052), we must conclude that counsels' failure to object to the inadmissible evidence undermines confidence in the outcome and therefore prejudiced Mr. Ott.

¶ 48 We therefore remand to the trial court with instructions to afford Mr. Ott a new sentencing hearing.

## CONCLUSION

¶ 49 The facts and issues presented by this case are very complex. Although we first questioned whether Mr. Ott could properly plead to aggravated murder, we are without jurisdiction to address his guilty plea because his failure to move to withdraw the plea is a jurisdictional bar on this court. Mr. Ott

brought several claims addressing his counsels' ineffective assistance. Today, we address only the argument that his counsel provided ineffective assistance for failing to object to victim impact evidence. Specifically, we hold that counsel was objectively deficient for failing to object to victim impact evidence that addressed Mr. Ott's character, chances for rehabilitation, and deserved sentence because such victim impact evidence clearly violates the Eighth Amendment when introduced in capital sentencing hearings. Counsels' failure to object to this evidence also prejudiced Mr. Ott such that the objectively deficient counsel constitutes ineffective assistance of counsel. We remand to the trial court for a new sentencing hearing consistent with this opinion.

¶ 50 Associate Chief Justice DURRANT and Justice WILKINS concur in Justice NEHRING's opinion.

DURHAM, Chief Justice, concurring:

¶ 51 I concur fully in the analysis and result of the majority opinion on the federal issue, but write separately to note my concern at the failure to engage first with the state law questions properly preserved and briefed. Structurally, I believe this court should determine first whether state law has been complied with before addressing claims that the federal Constitution has been violated. *West v. Thomson Newspapers*, 872 P.2d 999, 1005–06 (Utah 1994) (adopting the primacy approach wherein the court "looks first to state constitutional law, develops independent doctrine and precedent, and decides federal questions only when state law is not dispositive," and thus provides for a "consistent method" that accords "with the original purpose of the federal system" (internal quotation marks omitted)); *see also State v. Briggs*, 2008 UT 83, ¶ 52, 199 P.3d 935 (Durham, C.J., concurring) ("The failure to undertake independent state analysis in cases where state law is argued contributes to a paucity of precedent and the absence of an independent and adequate state ground for our holding."); *State v. Tiedemann*, 2007 UT 49, ¶ 33, 162 P.3d 1106 ("[I]t is part of the inherent logic of federalism that state law be interpreted independently and *prior to* con-

sideration of federal questions."); *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998) ("[W]hen a party asserts claims under both the Utah and federal Constitutions, this court ordinarily first determines the issue under the Utah Constitution and only resorts to the federal Constitution if the state constitution is not dispositive.").

¶ 52 Justice PARRISH concurs in Chief Justice DURHAM's concurring opinion.