2014 UT App 10

**STATE of Utah, Plaintiff and Appellee,**

v.

**Nathan REDCAP, Defendant and Appellant.**

**No. 20120077–CA.**

Court of Appeals of Utah.

Jan. 16, 2014.

---

Lori J. Seppi, for Appellant.

Sean D. Reyes and Jeanne B. Inouye, for Appellee.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judges JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN concurred.

Opinion

VOROS, Judge:

¶ 1 This case arises from a fight at the Utah State Prison. Uncontroverted evidence at trial established that Defendant Nathan Redcap, an inmate, stabbed an inmate named Wilson. Redcap had surreptitiously remained out of his cell after he should have returned to it. He shielded his torso with body armor improvised from magazines and attached a shank to each hand.[1] Redcap was charged with attempted murder and other offenses. He was convicted of one count of aggravated assault by a prisoner and two counts of possessing items prohibited in a correctional facility.[2] We affirm.

## BACKGROUND

¶ 2 November 29, 2005, was laundry day in the prison. On laundry day, cells are opened one at a time to allow inmates to collect their laundry bags from the common area. Redcap retrieved his laundry bag, but instead of returning to his cell as required, he hid. When Wilson was released to retrieve his laundry bag from the common area, Redcap attacked him. Wilson eventually escaped to the shower room adjacent to the common area.

---

1. "A shank is a crude, homemade … 'knife' usually about three to four inches in length." *State v. Kell*, 2002 UT 106, ¶ 5 n. 1, 61 P.3d 1019.

2. *See* Utah Code Ann. § 76-5-103.5(a) (Lexis-Nexis 2003); *id.* § 76-8-311.3 (Supp.2005).

¶ 3 Two correctional officers who responded to the incident later testified that they did not see the fight begin. But they did see a shank in each of Redcap's hands and did not see a weapon in Wilson's hands. After quelling the fight, the officers ordered Redcap to disarm. He removed a loop securing the first shank to one hand and then untied the other shank from his other hand. He dropped both shanks to the floor. When Redcap removed his sweatshirt, several magazines wrapped around his torso for protection fell to the ground.

¶ 4 A low-resolution security camera recorded part of the incident. The footage shows Wilson emerging from his cell to retrieve his laundry from the common area. Redcap descends the stairs and confronts Wilson. Wilson initially retreats and Redcap follows as they begin circling and feinting at one another. Approximately thirty-five seconds later, Redcap moves out of the camera's view and Wilson follows.

¶ 5 At trial, Redcap claimed self-defense. He argued that Wilson had previously threatened his life and that Wilson instigated the fight. Redcap called two inmates to the stand who each claimed to have observed the fight from his cell. The first inmate testified that he had seen most of the fight, that Redcap had not been holding a weapon, and that Wilson took something from his laundry bag that the inmate believed was a weapon. The inmate also testified that Wilson was the aggressor. The second inmate (Witness) was a friend of Wilson's. According to Witness, Wilson had threatened to kill Redcap a few days before the fight. At that time, Redcap replied that he was not going to run from Wilson. Witness further testified that both Wilson and Redcap had shanks during the fight and that Wilson, after retreating to the shower area, had thrown his to the floor near Redcap.

¶ 6 The prosecution impeached Witness with testimony from an investigator. The investigator testified that he visited Witness's cell a week before trial and "took some photographs from inside the cell ... [to] kind

of get a [perspective] of that view that the inmate would have." He listed the limitations on the view from inside the cell: "your view is obstructed looking out into the common area," "you can't see down into the shower area," and "you can't see directly [along] the wall because there's some pillars that are sticking out a little ways from the cement wall." When asked whether he was "able to see ... down towards the shower where [Witness] said he could see things," the investigator responded, "No." To support this testimony, the prosecution then introduced several photographs taken by the investigator of the cell and from within the cell.

¶ 7 The defense objected to the investigator's testimony and to admission of the photographs on the ground that they had not been disclosed before trial as required by rule 16 of the Utah Rules of Criminal Procedure. The trial court overruled the objection "for the time being." On redirect examination, the defense elicited from the investigator admissions that a camera could not depict the entire view possible from within the cell, that Witness could have seen the area by the stairs where the fight began and the common area where it continued, and that the investigator's testimony challenged only Witness's claim to have seen the fight end by the shower. The next day, the trial court announced it would postpone a final decision on this discovery issue until after the verdict.

¶ 8 The jury acquitted Redcap of attempted murder but convicted him of aggravated assault and two counts of possessing prison contraband. Redcap moved for a new trial on the ground that the prosecution committed discovery violations involving the second investigation and the photographs taken by the investigator. After an evidentiary hearing, the trial court denied Redcap's motion.[3]

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Redcap first contends that the trial court erred by denying his motion for new trial due to the prosecution's failure to turn over relevant discovery as required by

---

**3.** Redcap's motion for new trial also alleged that the prosecution had failed to turn over an interview with Witness. The trial court found that

the prosecution had provided the interview. On appeal, Redcap does not challenge this ruling.

rule 16 of the Utah Rules of Criminal Procedure. "A trial court's ruling on a rule 16 issue is reviewed for an abuse of discretion." *State v. Dick*, 2012 UT App 161, ¶ 2, 280 P.3d 445.

 ¶ 10 Redcap next contends that several statements in the prosecutor's closing rebuttal argument constituted prosecutorial misconduct. Redcap concedes that this claim was not preserved and seeks review under the plain error exception to the preservation requirement. He also alleges ineffective assistance of counsel. To establish plain error, an appellant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). And "[a]n ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Ott*, 2010 UT 1, ¶ 22, 247 P.3d 344 (citation and internal quotation marks omitted).

## ANALYSIS

### I. Discovery Violations

¶ 11 Redcap contends that the trial court erred in denying his motion for new trial. That motion alleged that the prosecution had failed to turn over relevant evidence in discovery. In 2006, Redcap requested any photographs taken of the scene by any law enforcement officer and any investigative reports made during the course of investigation. The prosecution initially complied and provided several photographs taken immediately after the fight and a report from the investigator. However, a week before trial, the investigator conducted another investigation of the views possible from Witness's cell. In the course of the second investigation, he took several additional photographs (the Photographs). The prosecution did not turn over the Photographs or other results of this investigation. At trial, the prosecution cross-examined the investigator about the second investigation and introduced the Photographs. Redcap objected to both the investigator's testimony and the Photographs.

 ¶ 12 Rule 16 of the Utah Rules of Criminal Procedure governs the discovery process and imposes on the prosecution a "continuing duty to make disclosure." Utah R.Crim. P. 16(b). When the prosecution responds voluntarily to a discovery request, as it did here, two duties arise. First, the prosecution must either produce all of the material requested or specifically identify those portions that will not be produced. *State v. Knight*, 734 P.2d 913, 916–17 (Utah 1987). "Second, when the prosecution agrees to produce any of the material requested, it must continue to disclose such material on an ongoing basis to the defense." *Id.* at 917. "Therefore, if the prosecution agrees to produce certain specified material and it later comes into possession of additional material that falls within that same specification, it has to produce the later-acquired material." *Id.* Failure to do so is a discovery violation. *Id.* "For the misleading-the-defense rationale to apply, the discovery request must be sufficiently specific to permit the prosecution to understand what is sought and to justify the parallel assumption on the part of the defense that material not produced does not exist." *Id.*

 ¶ 13 Rule 30(a) of the Utah Rules of Criminal Procedure provides that "[a]ny error ... which does not affect the substantial rights of a party shall be disregarded." Rule 30 ordinarily places the burden to show prejudice on the defendant. *See State v. Bell*, 770 P.2d 100, 106 (Utah 1988). But a discovery violation claim may shift the burden to the State to show that the violation was harmless. *See id.* This is because a rule 30 inquiry "normally is based upon a review of the record," and when the error consists of the prosecution's failure to produce inculpatory evidence, "the record does not provide much assistance in discovering the nature or magnitude of the resulting prejudice to the defense." *Knight*, 734 P.2d at 920. "The record cannot reveal how knowledge of this evidence would have affected the actions of defense counsel, either in preparing for trial or in presenting the case to the jury." *Id.*

 ¶ 14 Therefore, in such cases, "when the defendant can make a credible argument that the prosecutor's errors have impaired

the defense, it is up to the State to persuade the court that there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for the defendant." *Id.* at 921. The State can meet this burden "by showing that despite the errors, the outcome of trial merits confidence and there is no reasonable likelihood of a more favorable result for defendant." *Id.* A reasonable likelihood is one " 'sufficient to undermine confidence in the outcome.' " *Id.* at 920 (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

¶ 15 In *Knight,* because the withheld evidence was crucial to the defense strategy, the discovery violation was sufficiently egregious as to undermine the supreme court's confidence in the outcome. *Id.* at 921. Knight was charged with aggravated robbery. *Id.* at 914.. Defense counsel made appropriate discovery requests for a list of the prosecution's witnesses, the witnesses' contact information, and any statements taken from those witnesses. *Id.* at 915. The prosecution responded that it had been unable to contact two of the identified witnesses and did not produce statements taken from them. *Id.* However, an investigator had in fact taken statements from those witnesses. *Id.* The gist of the statements was that Knight had asked one of the witnesses to falsify an alibi and had asked the other to pick Knight and his partner up after they had abandoned a getaway vehicle. *Id.* at 915–16.

¶ 16 Shortly before trial, the prosecution obtained contact information for both witnesses but did not turn over this information before trial. *Id.* at 915. On the first day of trial, defense counsel learned of the witnesses' statements and that the witnesses would be testifying the following day. *Id.* at 916. After rejecting defense counsel's objections to the witnesses' testimonies, motion for mistrial, and request for a continuance, the trial court allowed the witnesses to testify; the trial resulted in Knight's conviction. *Id.* Our supreme court reversed Knight's conviction, holding that a discovery violation had taken place, that Knight had presented a

credible claim that his defense was impaired, and that the State had not shown that the errors were harmless. *Id.* at 921. The *Knight* court could not "determine with any certainty from the record whether, absent the prosecutor's nondisclosures, the defense would have been better prepared" to counter the witnesses' testimony. Accordingly, the court held that the State bore the burden of persuasion and had failed to meet it. *Id.*

■ ¶ 17 Here, we must first determine whether a discovery violation took place. We agree with the trial court, which ruled that the prosecution violated the continuing discovery duty explained in *Knight:*

> In this case, the State did not object to Mr. Redcap's discovery request but produced many of the requested materials.... Consequently, the State was required to either provide Mr. Redcap with the omitted photographs or identify the photographs as material that would not be produced. The State failed to comply with that requirement when it did not produce the photographs before trial.

The record before us shows that Redcap filed a formal request for discovery in 2006, seeking "[a]ny photographs ... taken from ... the alleged crime scene or taken by any law enforcement officer during the course of investigation [or] by such police department, District Attorney, its staff or investigative agencies." He also requested "[a]ny police or investigative reports excluding the Salt Lake District Attorney's work product, made during the course of investigation or prosecution of this case." On appeal, the State does not claim to have produced the Photographs.[4] Instead, it asserts that the prosecution had no duty to produce the Photographs and that failure to do so was not a violation of rule 16's continuing discovery requirement. *Cf.* Utah R.Crim. P. 16(b); *Knight,* 734 P.2d at 917. Based on the record before us, we agree with Redcap and the trial court that the prosecution's failure to provide the Photographs to Redcap before trial constituted a discovery violation.

---

**4.** The State does claim in a footnote that at least one of the Photographs was provided to Redcap.

However, the State does not claim to have provided all of the Photographs introduced at trial.

¶ 18 Redcap also argues that the prosecution improperly withheld the investigator's report of his second investigation. Consequently, Redcap asserts, the investigator should not have been allowed to testify as to his conclusions drawn from that investigation. This claim was preserved in his motion for new trial. The State responds that Redcap "has not demonstrated that there was such a report, much less that the prosecutor suppressed it."

¶ 19 We recognize that Redcap's discovery request sought "reports made" by investigators—a phrase that might be read narrowly as limited to written documents. But "[r]ules that govern criminal proceedings are meant to ensure that a trial is a search for truth and that the verdict merits confidence." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). Thus, the relevant question is not whether the investigator's report was committed to writing, but whether the prosecution was aware of, yet did not disclose, the results of an investigation relied upon at trial. Moreover, on appeal the State does not explicitly deny the existence of a report. Rather, it argues that "defense counsel knew of no such report" and that "[Redcap] has not demonstrated that there was such a report."

¶ 20 "A criminal trial is more than a contest between the prosecution and the defense; it is a search for the truth." *State v. Hay*, 859 P.2d 1, 7 (Utah 1993) (citations and internal quotation marks omitted). Here, the investigator conducted a second investigation on behalf of the prosecution, gathered relevant facts, took photographs, and provided the results of the investigation to the prosecutor. We hold that the results of such an investigation fall within defense counsel's request for "police or investigative reports excluding the Salt Lake District Attorney's work product, made during the course of investigation or prosecution of this case." First, the facts gathered by the investigator were obviously "reported" to the prosecutor. And they were the kind of material that might well be memorialized in a written report and that reasonable defense counsel might therefore expect to be produced in response to a discovery request. And sec-

ond, a contrary rule would create a perverse incentive to gather evidence but not reduce it to writing lest it fall within a discovery request. Because the prosecution did not disclose this information to Redcap before trial, we hold that the prosecution committed a second discovery violation.

¶ 21 Having determined that the prosecution committed discovery violations, we next consider whether Redcap has raised a "credible argument that the prosecutor's errors ... impaired" his defense, thereby shifting to the State the burden of persuasion on the issue of prejudice. *See Knight*, 734 P.2d at 921. "[I]n assessing whether the defendant's argument of prejudicial impairment [rings] sufficiently true to warrant shifting the burden of persuasion to the State, we ... take into account the centrality of the matter affected by the prosecutor's errors." *State v. Bell*, 770 P.2d 100, 106 (Utah 1988).

¶ 22 Redcap argues that the discovery violations impaired his defense because, had the material been produced, he would have conducted his defense differently. Specifically, he notes that if he had known of the limitations on the view from the cell he could have more closely questioned Witness on direct examination to establish which portions of the fight Witness was able to observe and how he did so. He claims that this would have helped him retain Witness's overall credibility. Redcap also suggests that his counsel could have visited the cell and taken photographs from different angles to show Witness's actual view, rehabilitating Witness's credibility after impeachment. Finally, Redcap asserts that his counsel could have interviewed other witnesses, of which there were "up to 30," in hopes of finding one with a clearer view of the end of the fight.

¶ 23 In sum, Redcap points to several actions he could have taken had he known of the Photographs. It is difficult to determine "from the record, whether, absent the prosecutor's nondisclosures, the defense would have been better prepared to meet" the testimony impeaching Witness. *See Knight*, 734 P.2d at 921. Although for reasons explained below we do not believe that the surprise evidence was "pivotal," *see id.*, we conclude

that Redcap has presented a credible claim of impairment. Accordingly, the burden rests upon the State to show that "there is no reasonable likelihood that absent the error, the outcome of trial would have been more favorable for the defendant." *See id.*

¶ 24 After reviewing the record, we see no reasonable likelihood that, absent the discovery violations, the outcome of trial would have been more favorable for Redcap. First, Witness's credibility in the eyes of the jury was in doubt even before the State impeached him with the withheld evidence. Witness is a convicted felon serving a life sentence for murder, kidnapping, and robbery. His trial testimony that the fight started in front of his cell differed from his earlier responses to investigators that the fight started by the shower. And video evidence refuted Witness's responses to investigators that Redcap was not wearing a shirt. Accordingly, Witness was already subject to impeachment.

¶ 25 Moreover, the Photographs did not impeach the key portions of Witness's trial testimony. He testified that Wilson had previously threatened Redcap, that nothing obstructed his view while the combatants were on the floor, and that he had seen Wilson holding a shank at some point during the fight. He also conceded that his view did not extend to the corners of the wall his cell was set into.

¶ 26 While several of the Photographs show the view from inside Witness's cell, none were taken from against the window, where Witness would have had the widest possible view. Instead, they were taken from several feet away from the window. Thus, none of the Photographs depict the view Witness actually had. The investigator admitted that the camera could not get as wide a view as an "eyeball pressed to that window" and that Witness could have seen most of the common area where the fight took place, the tables where the laundry was placed, and the portion of the room "where it started." Because the Photographs did not show the entirety of his view, they could not, by themselves, impeach his testimony about what was within that view.

¶ 27 The prosecutor argued in his closing rebuttal that "[Witness] says ... he sees things that he doesn't see" and that Witness's testimony that he could see the shower "is physically impossible." This comment may be understood as referring to the investigator's testimony, when asked if Witness was "physically [able to] see what he said he saw," that the investigator did not "know how [Witness] would [have been] able to." [5] But it may have been referring to various other discrepancies in Witness's testimony. For example, Witness testified that he saw Wilson run "to the shower and close[ ] it" despite his own admission that his view did not extend to the corners of the room (where the shower door was located).

¶ 28 But even if the challenged photographs and testimony marginally eroded Witness's credibility, unchallenged testimony strongly supports Redcap's conviction. Both officers who responded to the fight testified that, at least by the end of the fight, Redcap was in possession of both shanks, one attached to each hand. And Redcap's defense counsel conceded that Redcap had brought at least one shank to the fight. The responding officers also testified that Redcap had secured one shank by tying it to his hand and had placed magazines under his sweatshirt, apparently as a form of makeshift body armor. One officer testified that Redcap was released from his cell to retrieve his laundry but did not return to his cell and instead hid in the shower until Wilson was out of his own cell. Furthermore, much of the encounter, including Redcap's descending the stairs to confront Wilson, as well as part of the fight itself, was captured on video.

¶ 29 In short, the evidence before the jury was that Redcap was armed, armored, and lying in wait to ambush Wilson. Witness's testimony did not contradict any of this evidence. Thus, even if Witness had never been impeached by the investigator's testimony or

5. The investigator clarified that his testimony about Witness's limited view "just challeng[ed] part of what [Witness] said, not the whole statement" and admitted that "[o]bviously [Witness] saw what happened originally down by the stairs in that area when they were moving around in the common area."

the Photographs, ample evidence before the jury refuted Redcap's trial argument that he acted in self-defense.

¶ 30 "For an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987). Considering the totality of the evidence in this case and the limited scope of Witness's testimony, our confidence in the verdict has not been undermined. We conclude that the prosecution's discovery violations did not affect Redcap's substantial rights. *See* Utah R.Crim. P. 30(a). Therefore, the trial court did not abuse its discretion in denying Redcap's motion for new trial.

## II. Prosecutorial Misconduct

¶ 31 Redcap next contends that the prosecutor committed misconduct during his rebuttal closing argument by describing the prosecution's witnesses as credible, by suggesting that the defense's witnesses did not take seriously the oath to tell the truth, and by drawing a parallel between the prison and a zoo.

¶ 32 Because "closing arguments are not evidentiary in nature," trial counsel has wide latitude in closing arguments and is "permitted to comment on the evidence already introduced and to argue reasonable inferences therefrom." *State v. Tillman*, 750 P.2d 546, 561 n. 45 (Utah 1987). To determine whether remarks made by a prosecutor require reversal, we consider whether the remarks called the jurors' attention to matters which they would not be justified in considering in reaching a verdict and, if so, whether the remarks were harmless beyond a reasonable doubt. *State v. Davis*, 2013 UT App 228, ¶¶ 12, 18, 311 P.3d 538 (noting the unsettled standard of prejudice and applying the harmless-beyond-a-reasonable-doubt standard as a matter of caution "even though the challenge to the error was unpreserved and does not involve a violation of a fundamental constitutional right").

¶ 33 "Claims of prosecutorial misconduct are subject to the preservation rule." *State v. Pedersen*, 2010 UT App 38, ¶ 11, 227 P.3d 1264. Redcap's trial counsel did not preserve the present claim. "The failure of defense counsel to object to statements made by a prosecutor during the closing is a matter to which we attach significance." *Commonwealth v. Leach*, 73 Mass.App.Ct. 758, 901 N.E.2d 708, 717 (2009). "It is not only a sign that what was said sounded less exciting at trial than appellate counsel now would have it seem, but it is also some indication that the tone and manner of the now challenged aspect of the prosecutor's argument were not unfairly prejudicial." *Id.* (brackets, ellipsis, citations, and internal quotation marks omitted).

¶ 34 Generally, where a defendant has not preserved a prosecutorial misconduct claim, appellate review is limited to a determination of whether it was plain error for the trial court not to have intervened. *See State v. Ross*, 2007 UT 89, ¶¶ 17, 58, 174 P.3d 628; *Davis*, 2013 UT App 228, ¶ 24 & n. 3, 311 P.3d 538; *Pedersen*, 2010 UT App 38, ¶ 11, 227 P.3d 1264. To establish plain error, an appellant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993).

¶ 35 In addition, Redcap contends that, by not objecting, his trial counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffective assistance of counsel, an appellant must show that (i) counsel's performance "fell below an objective standard of reasonableness" and (ii) "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

## A. Officers' Credibility

■ ¶ 36 Redcap contends that it was improper for the prosecutor to suggest that the jury find the testifying officers credible. In closing argument, Redcap's counsel asserted that the officers were not credible because "[t]hey've said they've seen things in the video that just aren't there" and they "went so far as to refuse to acknowledge that their views were obstructed." He also argued that one of the officers had "a job to do and that's to try to get a conviction." In response, the prosecutor argued that the officers who testified for the prosecution were "credible, they have no bias," because "their job is to protect everybody out there" and "[t]hey're on duty to protect all the inmates."

■ ¶ 37 When a prosecutor discusses the credibility of witnesses during closing arguments, " 'the evil to be guarded against' ... is that 'a juror would consider such statements to be factual testimony from the prosecutor.' " *State v. Davis*, 2013 UT App 228, ¶ 35, 311 P.3d 538 (brackets omitted) (quoting *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988)). Consequently, "a prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799. "However, a prosecutor may draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions." *Id.*

■ ¶ 38 In determining whether a prosecutor's comments amount to plain error, "we will consider the comments both in context of the arguments advanced by both sides as well as in context of all the evidence." *Id.* ¶ 56. "It is well settled that prejudicial error does not result from ... improper remarks made during closing argument when such remarks were provoked by the opposing counsel." *United States v. Schwartz*, 655 F.2d 140, 142 (8th Cir.1981). The "doctrine of fair reply" allows a prosecutor to make a "counteracting statement" after "defense counsel [opens] the door on the issue." *Id.* We recently applied the fair reply doctrine in *State v. Wright*, 2013 UT App 142, 304 P.3d 887. There, we held that a prosecutor was "entitled to argue from the evidence at trial that [a witness] had a different motivation" for testifying after the defense "encouraged the jury to view the facts ... in a manner that supported [its] theory." *Id.* ¶¶ 38–40.

¶ 39 Here, the prosecutor's comments about the credibility of the testifying officers were a fair reply to defense counsel's argument that the officers were not credible and that they were tasked to secure a conviction. In addition, the prosecutor's comments were "permissible deductions from the evidence." *Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799. The officers had testified about the safety precautions taken by the prison to keep certain inmates apart, to limit the number of inmates out of their cells at any given moment, and to confiscate shanks and other improvised weapons. This testimony supported the prosecutor's assertion that the officers' "job is to protect ... all the inmates."

■ ¶ 40 Because these comments were unobjectionable, the trial court was not obligated to intervene. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). And because "[t]he Sixth Amendment does not require counsel to make futile objections," *State v. Ricks*, 2013 UT App 238, ¶ 22, 314 P.3d 1033 (citing *State v. Whittle*, 1999 UT 96, ¶ 34, 989 P.2d 52), Redcap's trial counsel did not render deficient performance by failing to object to the comments.

## B. Inmates' Credibility

■ ¶ 41 Redcap also contends that the prosecutor committed misconduct by suggesting that the jury discount the credibility of Redcap's witnesses. In closing, Redcap portrayed his witnesses in almost heroic terms: as inmates, they risked their lives to testify, and "the only reason" they did so was because the charges against Redcap were "such an injustice ... that they had to do something about it." The prosecutor responded that inmates "don't treat the oath to tell the truth with the same fervor that most people do" and suggested that the prospect of a perjury conviction had little deterrence value for them: when a witness is "in for life, what's a lie?" He also suggested that the

inmates' actual incentive to testify was that coming to court was "a vacation" and "a day out."

¶ 42 As explained above, *see supra* ¶ 37, prosecutorial misconduct occurs when the prosecutor "expresses personal opinion or asserts personal knowledge of the facts." *State v. Bakalov,* 1999 UT 45, ¶ 57, 979 P.2d 799. But a prosecutor does not commit misconduct if the challenged comments do no more than "draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions." *See id.*

¶ 43 Here, the challenged comments replied to the defense's closing argument and were reasonable deductions from the evidence adduced at trial. Witness had testified that he had been convicted of murder, kidnapping, and robbery. Another inmate testified that he had been convicted of forgery, fraud, and giving false information to the police. And the third testified that he had been convicted of aggravated robbery. Moreover, portions of the inmates' testimonies differed from that given by the officers, from the video, and from statements the inmates had earlier given to investigators. And a reasonable person might conclude that an inmate serving a life sentence might be less deterred by the risk of a perjury conviction than a non-inmate. In short, jurors could infer from the trial evidence that these inmates did not take their oaths "with the same fervor" as some other witnesses.

¶ 44 Accordingly, we conclude that the prosecutor did not commit misconduct by inviting the jury to draw those inferences. Consequently, the trial court committed no error by not intervening. *See State v. Ross,* 2007 UT 89, ¶¶ 54–58, 174 P.3d 628. Moreover, because we have determined that the prosecutor's comments did not constitute misconduct, any objection to them at trial would have been futile. "The Sixth Amendment does not require counsel to make futile objections." *State v. Ricks,* 2013 UT App 238, ¶ 22, 314 P.3d 1033 (citing *State v. Whittle,* 1999 UT 96, ¶ 34, 989 P.2d 52). Accordingly, Redcap has not shown that his counsel's performance "fell below an objective standard of reasonableness." *See Strickland*

*v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

C. Denigration

 ¶ 45 Finally, Redcap contends that the prosecutor committed misconduct when he "characterized the defense witnesses as zoo animals who lived in cages and were governed by zoo rules" and "called them convicts and criminals who should be sent to an island to have at each other because they get what they deserve." He also argues that "the prosecutor compared Redcap to a predator such as a wolf or fox."

¶ 46 The challenged comments are best understood in context. In closing argument, defense counsel stated, "You've heard about the prisoners and how they live … I believe they live in a situation that is inhuman…. [P]eople might think, well, they deserve what they get[;] but it's still not a very pleasant situation, it's horrible." Responding to the idea that "people might think" that prisoners "deserve what they get," the prosecutor argued that they were entitled to the protection of the law:

> Defense counsel made a point [that] it's easy enough to say that, you know what? These are convicts, they're criminals, you've heard it, put them all on an island, let them have at each other, you know what, they get what they deserve. But the fact of the matter is, the law says, the law that you need to uphold is they all have rights, okay? Regardless of what you think of the correctional system, they all have rights.

The prosecutor then analogized the prison environment to a zoo:

> They have rules out there, just like a zoo. The zoo has rules, they keep certain predators and prey away from each other for that reason. It's just like the zoo in a lot of ways. You don't put the wolves by the lambs, you don't put the foxes and the chickens together. You keep them apart because they don't get along. It will not work. Just like … rival gangs, you keep them apart.

¶ 47 Read in context, the prosecutor's comments did not advocate, as Redcap claims,

sending him or his witnesses to an island to "get what they deserve." The prosecutor was in fact making the opposite point: that Redcap and the other inmates should not be left to fend for themselves in a lawless environment, but rather that life in prison, like life outside it, must be governed by rules—in particular, he implied, rules requiring the prisoners to be in their cells at certain times. This comment set up his statements about separating predators from prey.

¶ 48 We agree with Redcap that the prosecutor analogized the prison to a zoo where predators such as wolves and foxes were caged separately from prey such as lambs and chickens. This analogy to animals had a tendency to demean the inmates involved in the case, including both Redcap and Wilson. The demeaning tone of the analogy was underscored by the colloquial meaning of the word *zoo* as "a place, situation, or group that is crowded, loud, and uncontrolled." Merriam–Webster.com, http://www.merriamwebster.com/dictionary/zoo (last visited Jan. 13, 2014).[6]

¶ 49 Notwithstanding the negative implications of the word *zoo,* the direct application of the prosecutor's analogy in context was that Redcap and Wilson were not allowed to be out of their cells at the same time. By clear implication, the comment cast Redcap—armed, armored, and out of his cell—in the role of predator and Wilson in the role of prey. Its thrust was to frame the central question of the case—whether this was an unprovoked attack or self-defense—in terms favorable to the prosecutor's theory of the case. We thus conclude that these comments fall within the "wide latitude" permitted trial counsel in closing arguments. *See State v. Tillman,* 750 P.2d 546, 561 n. 45 (Utah 1987). Consequently, Redcap has not demonstrated that the prosecutor's comment was so objectionable that it was "plain error for the trial court not to have intervened," *see State v. Ross,* 2007 UT 89, ¶ 58, 174 P.3d 628, or that his trial counsel rendered deficient performance by not objecting, *see State v. Ricks,* 2013 UT App 238, ¶ 22, 314 P.3d 1033.

¶ 50 But even if obvious error or deficient performance were present here, Redcap suffered no reversible prejudice. Plain error claims and ineffective assistance of counsel claims share a "common standard" of prejudice. *State v. Litherland,* 2000 UT 76, ¶ 31 n. 14, 12 P.3d 92; *State v. Verde,* 770 P.2d 116, 124 n. 15 (Utah 1989). As explained above, *see supra* ¶ 32, out of an abundance of caution, we have assumed the applicable standard in prosecutorial misconduct cases to be harmless beyond a reasonable doubt.

¶ 51 The United States Court of Appeals for the Ninth Circuit has stated, "Name calling is not an admirable style of argument and we do not condone it, but this court has been reluctant to find it cause for reversal." *United States v. Berry,* 627 F.2d 193, 200 (9th Cir.1980) (citing *United States v. Taxe,* 540 F.2d 961 (9th Cir.1976) (holding that referring to defendant as a "scavenger" and "parasite" was not a violation of due process, because evidence adduced at trial led to a reasonable inference that defendant was profiting at the expense of copyright owners)). Indeed, referring to the accused and the victim as predator and prey, though widely criticized, rarely results in reversal. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 180–83 & n. 12, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (holding that a defendant was not denied a fair trial by an "undoubtedly ... improper" summation in which the prosecutor compared the defendant to an animal who should only be let out of his prison cell on a leash and stated that he wished the victim had blown the defendant's face off and that the defendant had used his final bullet on himself); *Banks v. Workman,* 692 F.3d 1133, 1149 (10th Cir.2012) (holding that the prosecutor's calling the defendant a "wild animal that stalks its prey," "a predator who lurks in the shadows," a "monster who selects the most helpless victims," and a "Mafia style killer," though "highly questionable at best," did not violate the defendant's constitutional rights); *United States v. Ebron,* 683 F.3d 105, 142–43 (5th Cir.2012) (the prosecutor's statement that "[l]ions and tigers ... do not stalk animals they're not

---

6. In closing, defense counsel described the prison in similar language: "The prison system is so inhuman it drives men to madness and it fuels violence among some, and they end up fighting."

going to kill, and what we saw on that videotape was nothing less than predators stalking someone who was about to be killed" and suggestion to the jury that a photograph in evidence depicted "two predators set up, prestaged, ready to go kill their quarry" were "colorful pejoratives" but not "so inflammatory that they substantially affect a defendant's right to a fair trial" and thus not improper); *Hein v. Sullivan*, 601 F.3d 897, 913, 916 (9th Cir.2010) (holding that, though improper, a prosecutor's comparison of the defendants to "a pack of wolves" did not affect the fairness of their trial); *Jackson v. McKune*, 121 Fed.Appx. 830, 833 (10th Cir. 2005) (order denying a certificate of appealability after agreeing with the Kansas Supreme Court that a prosecutor's comments likening a defendant to a " 'wild animal' preying on victims . . . did not have a substantial effect on the outcome of the trial"); *Williams v. State*, 627 So.2d 994, 996 (Ala. Crim.App.1992) (the prosecutor's reference to the defendant as "a predator" was a "legitimate comment[ ] on the evidence presented at trial"); *People v. Hines*, 15 Cal.4th 997, 64 Cal.Rptr.2d 594, 938 P.2d 388, 433 (1997) (noting that, although an appellate challenge was barred by the defendant's failure to object at the penalty phase, the prosecutor's reference to the defendant as a "predator" was "[i]n any event [a] fair comment on the evidence presented at trial"); *People v. Alvarez*, 14 Cal.4th 155, 58 Cal.Rptr.2d 385, 926 P.2d 365, 419 (1996) (calling the defendant a "creep" and "worse than a predator[ ]" was not prosecutorial misconduct, because, although "unnecessarily colorful," the comments "were consistent with the evidence"); *People v. Gomez*, No. B219012, 2011 WL 1664734, at *8 (Cal.Ct.App. May 4, 2011) (the prosecutor's statements, "I just want to talk about prey and predators," "[t]here are foxes and there's hawks," the named victim "is prey," and the defendant "is a predator," were not improper because they were "fair comment[s] on the evidence"); *People v. Ivory*, 333 Ill.App.3d 505, 267 Ill.Dec. 391, 776 N.E.2d 763, 772–73 (2002) (prosecutor's reference to the defendant as "a wolf in sheep's clothing" and argument that he "was part of a pack of predators," though improper, was not reversible error); *Jones v. State*, 389

S.W.3d 253, 257–58 (Mo.Ct.App.2012) (the prosecutor's closing argument that the defendant "is a predator" and that the victims "were the perfect prey" was not an improper personalization because it "did not imply that [the defendant] posed a personal danger to the jurors or their families"); *People v. Chapin*, 265 A.D.2d 738, 697 N.Y.S.2d 713, 715 (1999) (although prosecutorial comments characterizing the defendant as a "predator" were inappropriate, they were "not so egregious to warrant reversal in light of the totality of the evidence" and the trial court's curative instructions); *People v. Brown*, 252 A.D.2d 835, 675 N.Y.S.2d 461, 462 (1998) (the prosecutor's use of the word "predator" did not warrant reversal because defense counsel did not specifically object to all of the challenged comments and, where objections were raised, any prejudice was ameliorated by the trial court's limiting instructions and the overwhelming proof of guilt); *State v. Trull*, 349 N.C. 428, 509 S.E.2d 178, 195 (1998) (referring to the defendant as a "predator" was "not so grossly improper as to require the trial court to intervene"); *Commonwealth v. Miles*, 545 Pa. 500, 681 A.2d 1295, 1302–03 (1996) (concluding that a prosecutor's comparison of the defendant's actions to the hunting style of "animals of prey" "did not . . . reveal his personal opinion of the defendant's guilt" and was, in any event, harmless beyond a reasonable doubt); *State v. Webb*, 389 S.C. 174, 697 S.E.2d 662, 664–65 (App.2010) (the prosecutor's comparison of the defendant to "hyenas"; description of hyenas as "wild, feral, a scavenger, a predator," and "vicious animals, predatory scavengers always looking for the easy prey"; and request to the jury to "cage this wild animal" "did not so infect the trial" as to deny the defendant due process); *Payne v. Commonwealth*, 257 Va. 216, 509 S.E.2d 293, 299 (1999) (calling the defendant a "predator" and a "monster" was a "fair comment on properly admitted evidence" in a sentencing hearing before a jury to determine whether the defendant would receive the death penalty); *Tennant v. State*, 786 P.2d 339, 346 (Wyo.1990) (calling the defendant a "leech, a blood sucker, and a predator" was not prosecutorial misconduct under the plain error

doctrine and in light of the record as a whole).

¶ 52 Predator references and animal analogies generally result in reversal only when combined with other, more egregious comments. *See, e.g., Bates v. Bell,* 402 F.3d 635, 643–49 (6th Cir.2005) (granting writ of habeas corpus due to the prosecutor's repeated reference to the defendant as a "rabid dog," the prosecutor's closing argument to the effect that failing to sentence the defendant to death would constitute sentencing future victims to death, the prosecutor's direct "appeal to the fears of individual jurors and to emotion," and explicit expressions of the prosecutor's personal opinions, which together called into question "the fairness of the entire sentencing hearing"); *United States ex rel. Griffith v. Hulick,* 587 F.Supp.2d 899, 912 (N.D.Ill.2008) (granting writ of habeas corpus on the ground that the prosecutor's "dehumanizing litany" comparing the defendant to a "deranged Energizer bunny, a walking barbeque tongs, and … a grenade in a baby carriage," and the prosecutor's "deliberate deception to win admission of highly prejudicial evidence, and her subsequent misuse of that evidence" resulted in a denial of due process). *Cf. Commonwealth v. Scarfo,* 416 Pa.Super. 329, 611 A.2d 242, 283 (1992) (a prosecutor's reference to a defendant as "a vicious vermin" and closing argument that "we have all the wolves and the leader of the pack in this room here on trial for the cowardly killing of the old, beaten, infirm[ ] prey of [the victim]" was improper and denied the defendants a fair trial), *superseded by statute on other grounds as stated in Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 895 (1998).

¶ 53 "In reviewing whether the jury was influenced by the [prosecutor's] statement, we consider the circumstances of the case as a whole." *State v. Kozlov,* 2012 UT App 114, ¶ 43, 276 P.3d 1207 (citation and internal quotation marks omitted). The prosecutor's comments here were confined but somewhat lengthy. And because they were made in rebuttal, the comments enjoyed a place of relative prominence in the trial as a whole, and Redcap had no opportunity to respond to them. On the other hand, the comments were themselves in part responsive to the defense's closing argument. The prosecutor did not misstate the evidence but rather framed the evidence in terms of the prosecution's theory of the case—albeit using a demeaning analogy. The analogy compared all the inmates to zoo animals and branded Redcap a predator. But the analogy was not inflammatory in the sense of implying that, if acquitted, Redcap might pose a threat to the jurors or their families. Moreover, the trial court repeatedly instructed the jury that the lawyers in the case were advocates and thus "[w]hat they may have said at any time during the proceedings and what they say during their closing arguments is not evidence." The court's instructions also included an admonition that the jurors not allow themselves to be influenced by "any bias, sympathy, or prejudice that you may feel toward one side or the other."

¶ 54 Most importantly, the evidence against Redcap was weighty. As noted above, *see supra* ¶ 28, Redcap tied at least one shank to his hand, wrapped magazines around his torso in a form of makeshift body armor, and lay in wait for Wilson rather than returning to his cell as required. Moreover, his ambush of Wilson and much of the ensuing fight were recorded on video. In the face of this uncontroverted evidence, Redcap's defense was that he acted in self-defense.

¶ 55 We agree with the Ninth Circuit that "[n]ame calling is not an admirable style of argument and we do not condone it." *United States v. Berry,* 627 F.2d 193, 200 (9th Cir. 1980). Nevertheless, the prosecutor's comments challenged on appeal do not undermine our confidence in the jury's verdict. We conclude that they were harmless beyond a reasonable doubt.[7] *See supra* ¶ 32.

---

7. Redcap also suggests that the prosecutor denigrated his defense as untrue by arguing to the jury, "You look at the video and [ask] why are we here?" and "Based on the evidence and testimony … this seems fairly clear." However, when read in context, the prosecutor was in fact explaining that "regardless of how good the evidence, everybody has a right to trial" even "if there's video" of the event in question. Accordingly, we do not agree with Redcap's assertion

### III. Cumulative Error

¶ 56 Redcap next contends that even if the errors committed at trial are insufficient to warrant reversal individually, this court "should reverse because the cumulative effect of the several errors undermines confidence" that Redcap had a fair trial. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). Here, we determined that the prosecution committed two discovery violations, but concluded that they did not warrant reversal due to the strong evidence supporting Redcap's conviction. We also rejected Redcap's other claims of error. Our confidence that Redcap received a fair trial has not been undermined. Accordingly, we reject Redcap's cumulative error claim.

### CONCLUSION

¶ 57 The prosecution committed discovery violations by keeping the Photographs from Redcap and by failing to provide Redcap with the results of the investigator's second investigation. However, these discovery violations did not affect Redcap's substantial rights. The prosecutor's closing rebuttal arguments relating to the credibility of witnesses were supported by record evidence. His other comments that compared inmates to animals did not constitute prosecutorial misconduct, were not so obviously erroneous as to alert the trial court that intervention may have been required, and did not prejudice Redcap under any standard. Finally, we reject Redcap's cumulative error claim because our confidence in the fairness of his trial has not been undermined.

¶ 58 Affirmed.

that these statements "stated a personal opinion," "denigrated the defense as obviously false," or "urged the jurors to feel personal hostility towards Redcap."