2018 UT App 66

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JEFFREY PARNELL RINGSTAD,
Appellant.

Second Amended Opinion[1]
No. 20150524-CA
Filed April 12, 2018

First District Court, Brigham City Department
The Honorable Thomas Willmore
No. 131100311

Stephen W. Howard, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Second Amended
Opinion, in which JUDGES GREGORY K. ORME and DAVID N.
MORTENSEN concurred.[2]

---

1. This Second Amended Opinion replaces the Amended
Opinion in Case No. 20150524-CA issued on October 26, 2017.
After our amended opinion issued, the State of Utah filed a
second petition for rehearing, and we called for a response. We
grant the second petition for the limited purpose of clarifying the
prejudice standard for unpreserved prosecutorial misconduct
claims.

2. Judge J. Frederic Voros Jr. was a member of the panel that
initially decided this case. He did not have the opportunity to
vote on the amended opinions prior to his retirement. Judge
Gregory K. Orme joined the panel following the retirement of
Judge Voros and upon receipt of the petitions for rehearing.

CHRISTIANSEN, Judge:

¶1    Jeffrey Parnell Ringstad (Defendant) appeals his convictions for two counts of rape of a child, one count of object rape of a child, two counts of sodomy on a child, and three counts of aggravated sexual abuse of a child, all first degree felonies. We affirm.

BACKGROUND[3]

¶2    Defendant married a woman (Mother) in September 2009. Defendant and Mother lived together with Mother's minor children—the victim (Victim) and her older sister (Sister).

¶3    In 2011, as the family was preparing to be "sealed" in an LDS temple, Mother asked Victim if she "felt worthy to go to the temple so [they] could have [their] forever family." According to Mother, Victim stated that she "felt like she was good but she didn't feel like everybody involved was [worthy]." Victim explained to Mother that "[Defendant] had been touching [her] inappropriately."

¶4    Mother confronted Defendant with Victim's allegations. Defendant denied sexually abusing Victim. Defendant suggested that "[Victim] was having nightmares, it must have been dreams, it wasn't true." Mother believed Defendant because he "was the man [she] was getting ready to go through the temple [with], he was a police officer, he was a firefighter." Mother and Defendant told Victim that she must have been dreaming

_____

3. "We view the facts in the light most favorable to the jury verdict and recite them accordingly." *State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237. "We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

because Defendant "would never do anything like that to [her]." Victim "went along with it."

¶5 Victim later testified that she "knew what had happened, . . . that [Defendant] was touching [her] and that they weren't dreams," but she went along with Mother and Defendant because Defendant had threatened to divorce Mother. Victim wanted "an eternal family" and wanted Defendant and Mother to stay together.

¶6 In September 2013, Defendant disclosed to Mother that he was having an affair, and they separated in October 2013. Defendant moved to live with his new girlfriend.[4] About a week after Defendant moved out, Victim told a school counselor that Defendant had sexually abused her. Victim later testified that she told the counselor because she "was losing [her] forever family."

¶7 In November 2013, a detective interviewed Victim after she received a referral from the Division of Child and Family Services. During her interview with the detective, Victim alleged that on at least two separate occasions, Defendant had "tried to put his penis inside of her and that it hurt." The detective also met with Mother, who relayed an allegation by Sister that Defendant had "come into her bedroom and wanted to cuddle with her," but Sister told him to get out.[5] The detective gave Sister an opportunity to make a written statement, but Sister did not make any disclosures regarding rape or other sexual abuse at that time. According to the detective, the witness statement form had "a disclaimer that tells people to make sure they fill that out honestly" and "if they fill it out and it's not honest, they could be charged with a crime."

---

4. Defendant and Mother later divorced.

5. The charges in the present case only concerned Defendant's sexual abuse of Victim.

¶8      Around that time, the detective also interviewed Defendant. A video recording of Defendant's interview was played for the jury at trial. In the recording, Defendant admitted that there were "a couple of incidents where [he and Victim] had some inappropriate touching." When the detective asked Defendant to explain "how [he] inappropriately touched [Victim]," Defendant explained, "I touched [Victim's] private areas with my hands and with my privates" "[t]wo or three" times.

¶9      In December 2013, a pediatric nurse physically examined both Victim and Sister. She testified that neither child's examination revealed any "trauma or . . . tearing or . . . scar tissue." The pediatric nurse explained that this was not unusual because "the body can . . . heal very quickly in that area."

¶10     Defendant was charged with two counts of rape of a child, one count of object rape of a child, two counts of sodomy on a child, and three counts of aggravated sexual abuse of a child.

*Victim's Testimony*

¶11     At trial, Victim testified that Defendant sexually abused her from the summer of 2011 through "June or July of 2013." The abuse occurred in Defendant's bedroom. According to Victim, Defendant called her "his baby girl" "[w]hile he was touching [her]," but he never called her that before the abuse began. Victim testified that there had been multiple instances of inappropriate touching, but she only testified with particularity about two instances.

¶12     Victim testified that the first instance had occurred in the early morning after Mother had gone to work. Defendant picked Victim up and carried her to his room, where he laid her on his bed and took off her clothes. Defendant took off his robe, revealing that he had no clothes on underneath. Victim had "no idea what was going on" and "was so scared." According to

Victim, Defendant told her "if [she] ever told anyone what he was about to do, that he would get a divorce with [her] mom." Defendant then got on top of Victim and started touching her breasts with his hands. Defendant also licked her vagina. Defendant then "sat up and . . . tried to push his penis" into Victim's vagina. When Victim told him to stop, Defendant "reached over to his night stand drawer and pulled out a bottle of green jelly." Defendant squeezed some of the jelly "on his finger and . . . started rubbing [Victim's] vagina with it and then he tried to push his penis into [her] vagina again." Defendant pushed his penis into Victim's vagina "[a] little bit" and ultimately ejaculated "[o]n top of [her] vagina."

¶13    Victim testified that the second incident also occurred in the early morning while Mother was at work. Defendant again carried Victim from her room to his room, laid her on his bed, and took off her clothes. She testified that Defendant was again wearing a robe but that this time, he wore religious "garments" underneath the robe. Defendant asked Victim "if [she] wanted to make love." When Victim asked Defendant what that meant, he replied, "I'll show you." Defendant then "put his finger in [Victim] and started fingering [her]." Victim told Defendant that she "didn't want to do this, that it hurt too much." Defendant then "reached over to his night stand drawer and . . . grabbed the bottle of green jelly." Defendant set the bottle on the bed and started licking Victim's vagina. He then rubbed the jelly on Victim's vagina and his penis and "tried to put his penis in [her] [while] he kept grabbing [her] breasts and squeezing them." Victim testified that Defendant again put his penis inside her "[a] little bit" and that he ejaculated in her vagina. Defendant told Victim that "[she] had to go sit on the toilet for it to come out."

¶14    Victim further testified that she did not "call for help" or tell anyone because she did not want anyone to know about the abuse and because Defendant was her "first image of a father and [she] wanted to keep it that way. [She] wanted her forever

family to be forever." In addition to the two specific instances that Victim described, she estimated that Defendant had touched her inappropriately more than ten times between the summers of 2011 and 2013, but she also testified it happened "sometimes once, twice a week."

*Sister's Testimony*

¶15　In November 2013, while she was visiting her grandmother for Thanksgiving, Sister claimed, for the first time, that she had also been previously sexually abused by Defendant. Sister met with the detective a second time after the Thanksgiving holiday. Sister testified at trial that Defendant had raped her approximately thirty times from early 2011 to the summer of 2013. Sister testified that the rapes occurred in her downstairs bedroom.

¶16　According to Sister, "[f]or the first little while, [Defendant] would just come down in his . . . garments," and "he would rub [her] back underneath [her] shirt." This happened for approximately six months. Sister testified that Defendant then started removing both his and Sister's clothes and raping her. Sister testified that the rapes were violent and that she would "try to fight and . . . kick and get away from him," but Defendant "started putting belts around [her], around [her] arms so that [she] couldn't flail." Sister stated that Defendant would sometimes bring his own belt to bind her arms, but more often than not he used her belt. Defendant threatened to divorce Mother if Sister told anyone.

¶17　Sister acknowledged that she had told police that during the rapes, Defendant would sometimes "throw [her] around and grip on [her] hair." Sister also told police that Defendant would "spank [her] buttocks so hard that it [became] red and it hurt" and that the rapes caused her to bleed. And while Victim had testified that Defendant called her his "baby girl" when he abused her, Sister testified that Defendant never called her that.

¶18    Sister further acknowledged that during and after the alleged abuse, she maintained good grades and participated in extracurricular activities. She also admitted that after Victim had reported Defendant's abuse, Mother had asked Sister if Defendant had been abusing her, and Sister had replied that he had not.

*Mother's Testimony*

¶19    Mother testified that although Victim told her in 2011 that Defendant had "been touching her inappropriately," Mother believed Defendant when he denied abusing Victim because "[h]e was the man that [she] was married to and getting ready to be sealed to."

¶20    Mother testified that when she learned that Defendant was having an affair with his new girlfriend, her "world crumbled" and she had "suicidal thoughts." Mother stated, "We were sealed in the temple, he was supposed to be my eternal spouse [but] he's having an affair."

¶21    According to Mother, there was "no possible way" that Victim could have independently known about the bottle of green jelly that Defendant had used on her. Mother testified that Victim had "no access to the bedroom" and that Defendant "was a very private person" who always kept the bedroom door locked when he and Mother were not home. Mother testified that the bedroom door was closed when she and Defendant were home and that she never found Victim "poking" around in their bedroom.

¶22    Mother admitted that after Defendant moved in with his new girlfriend, she went to their house and confronted Defendant and pushed him. She stated that she was "[v]ery angry at that time."

¶23    Mother further testified that Victim "was a social butterfly" and that both Victim and Sister were "[a]s normal as

teenagers can be." She stated that Defendant "had a closer relationship" with Victim because Defendant and Sister "butted heads." Lastly, Mother testified that both girls remained active in their extracurricular activities.

## *Defendant's Mother's Testimony*

¶24    Defendant's mother testified that she had stayed with the family during the summer of 2011 while she recovered from back surgery. She testified that she had not seen "anything that alarmed [her] in behaviors involving the children and [Defendant]" and that she did not see "any changes in any behaviors between the two girls and [Defendant]."

¶25    Defendant's mother testified that on one occasion after Defendant moved in with his new girlfriend, Mother went to the girlfriend's house and "took ahold of [Defendant] and just started shaking him." She also testified that Mother had stolen some of Defendant's property and that Mother had told her that she was "going to see that she got [Defendant's] annuity [from an accident] for her girls."

## *Defendant's Testimony*

¶26    Finally, Defendant testified. He denied ever raping either Victim or Sister. Defendant acknowledged that he had admitted in his interview with the detective that there had been some "inappropriate touching" between Victim and himself. In explaining what he meant by "inappropriate touching," Defendant testified that "[t]here had been a couple of times that [Victim] had come into the bedroom and had climbed up in bed with [him] to snuggle" and that "she'd pull[ed] herself in really close to [him]." He testified that he was once lying on his side when Victim "started pulling herself back into [him] a little bit tighter, kinda scooching back in, trying to get close" and that she had "started rubbing up against [his] private areas with her back side." He clarified that by "back side" he meant her "buttocks area."

¶27   According to Defendant, he and Victim had been lying there for a few minutes when she "reached up and grabbed [his] hand and was kinda rubbing herself with it." He testified that Victim "then pushed [his hand] down towards her private area" and that "when [he] realized [his] hand touched her private area" he "pulled [his] hand away and responded to her, telling her that's not what we do, it's not a good thing." Defendant testified that his garments never came off and that Victim's clothes never came off. He testified that "there [was] skin-to-skin touching" when Victim "pushed [his] hand down toward her private area" and that his "hand actually touch[ed] her private areas underneath the clothing."

¶28   Defendant further testified that a similar incident occurred a few weeks later. He stated that after the second incident he told Victim, "[W]e don't do that, that's not the right thing. I love you, we don't do things like this." Defendant denied ever being "sexually aroused with [Victim]" and stated that the inappropriate touching "was [not] something that [he] intended to have happen" nor "something [he] wanted to have happen." Defendant testified that Sister's testimony was untrue and that he had never tied her up.

¶29   On cross-examination, the prosecutor asked Defendant "to explain how [his] penis touched [Victim's] private parts," and Defendant replied, "I don't know." Defendant stated that Victim "had snuggled back into [him] and was grinding against [him], grinding into [his] private parts." Defendant stated that he did not tell Mother what had happened because he "knew that [she] would be very, very, very, very unhappy with any of it" and that he was trying to protect Victim. The prosecutor further asked Defendant, "So, [the detective] asked you if there was any inappropriate touching and you're telling me that you confessed to touching [Victim] in her private parts with her [sic] hands and your penis to protect [Victim] from her mother?" Defendant replied, "Yes." Defendant stated that he was initially willing to

confess to a crime to protect Victim, but he was no longer worried about protecting her.

¶30 Defendant also testified that several years previously, he suffered "severe closed-head injuries" that required brain surgery. Defendant stated that he still suffers from short-term and long-term memory problems.

¶31 The jury convicted Defendant on all counts. He now appeals.

ISSUES AND STANDARDS OF REVIEW

¶32 Defendant raises two principal issues on appeal. First, he contends that "the admission of evidence regarding other violent sexual crimes allegedly committed against a person other than the complaining witness was error that deprived [him] of his right to [a] fair trial." Second, he contends that "the prosecutor engaged in prosecutorial misconduct by repeatedly eliciting testimony and making argument regarding various religious matters not relevant to the charges, by arguing facts that were not in evidence, and by expressing his own personal opinion and personally disparaging [Defendant]." Defendant concedes that these issues were not preserved but asserts that we may reach their merits via the plain error and ineffective assistance of counsel exceptions to preservation. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Kennedy*, 2015 UT App 152, ¶ 23, 354 P.3d 775 (citation and internal quotation marks omitted). "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶33 Lastly, Defendant contends that "the cumulative effect of the several errors committed in the trial court deprived [him] of his right to a fair trial." "We will reverse a conviction under this doctrine when 'the cumulative effect of the several errors

undermines our confidence . . . that a fair trial was had.'" *State v. Lomu*, 2014 UT App 42, ¶ 7, 321 P.3d 235 (omission in original) (quoting *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993)).

ANALYSIS

I. Character Evidence

¶34 Defendant first contends that "evidence of uncharged rapes was inadmissible and prejudicial, requiring reversal." Defendant contends that his trial counsel was constitutionally ineffective for failing to object under rule 404(b) of the Utah Rules of Evidence to Sister's "allegations of extreme and violent rapes committed against" her by Defendant. Alternatively, Defendant contends that the trial court plainly erred by not excluding this evidence sua sponte under rule 404(b).

¶35 Around one month after Defendant and Mother separated, Sister came forward with allegations that she had been sexually abused by Defendant. At trial, Sister testified—without objection from trial counsel or intervention by the trial court—that Defendant had raped her approximately thirty times between early 2011 and the summer of 2013. Sister did not testify about specific incidents, stating that "[t]here wasn't much variation between each time."

¶36 According to Sister, "[f]or the first little while, [Defendant] would just come down [to her room] in his . . . garments," and "he would rub [her] back underneath [her] shirt." This happened "for about . . . six months." Sister testified that Defendant then started removing both his and Sister's clothes and raping her. Sister would "try to fight and . . . kick and get away from him," but Defendant "started putting belts around [her], around [her] arms so that [she] couldn't flail." Defendant threatened to divorce Mother if Sister told anyone. Sister testified that when Victim first reported Defendant, Sister had "an opportunity to write out a written

statement" but that she did not disclose the abuse then because she "was scared."⁶ Sister ultimately disclosed Defendant's alleged abuse in November 2013 when she visited her grandmother for Thanksgiving.

¶37 On cross-examination, Sister clarified that Defendant "only started wearing garments after he and [Mother] were sealed in the temple." Trial counsel asked Sister, "[S]o anything that he did with you was after the temple ceremony?" Sister replied, "No. No. No. . . . [H]e would come down in . . . clothes but then, towards the end, he would come in his garments." Sister stated that Defendant would sometimes massage her back and admitted that she never told Mother about it even though "at that time . . . [she] felt that that was inappropriate."

¶38 Trial counsel further elicited testimony from Sister that Defendant would often pull the belts so tight that her hands would go numb and she would feel "pins and needles in [her] fingers." Sister acknowledged that she had told police that Defendant made her bleed, that Defendant would "throw [her] around and grip on [her] hair or pull [her] hair," and that Defendant would "spank [her] buttocks so hard that it [became] red and it hurt." She stated that she would "yell[] out loud hoping that someone would hear," but "[n]obody heard." Sister confirmed that these incidents were violent and that she had testified at the preliminary hearing that Defendant "would tell [her] to shut up and . . . put his hand over [her] mouth."

¶39 Rule 404(b) of the Utah Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to

---

6. Trial counsel also elicited testimony from the detective that Sister had not disclosed any abuse in her written statement and that the witness statement "has a disclaimer that tells people to make sure they fill that out honestly" and "if they fill it out and it's not honest, they could be charged with a crime."

prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[7] *Id.* R. 404(b)(2).

A.     Ineffective Assistance of Counsel

¶40    Defendant contends that his trial counsel was constitutionally ineffective for "failing to object to evidence of uncharged crimes," "[p]articularly in light of the violent nature of the allegations."

¶41    To establish ineffective assistance of counsel, an appellant must demonstrate both "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An appellant must rebut "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted). "Given the

---

7. Additionally, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1). "'[C]hild molestation' means an act committed in relation to a child under the age of 14 which would, if committed in this state, be a sexual offense or an attempt to commit a sexual offense." *Id.* R. 404(c)(3). Neither party addresses rule 404(c) in the briefing, and the record on appeal is not clear regarding Sister's age when the alleged abuse started. We therefore decline to address rule 404(c) further.

strong presumption of competence, we need not come to a conclusion that counsel, in fact, had a specific strategy in mind." *State v. Isom*, 2015 UT App 160, ¶ 37, 354 P.3d 791 (citation and internal quotation marks omitted). "Instead we need only articulate some plausible strategic explanation for counsel's behavior." *Id.* (citation and internal quotation marks omitted). Regarding prejudice, "[a] defendant suffers prejudice when, absent the deficiencies of counsel's performance, there is a reasonable likelihood that the defendant would have received a more favorable result at trial." *State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769. "Because both deficient performance and resulting prejudice are requisite elements of an ineffective assistance of counsel claim, a failure to prove either element defeats the claim." *Id.* "Additionally, whenever there is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel." *State v. Ott*, 2010 UT 1, ¶ 34, 247 P.3d 344 (citation and internal quotation marks omitted).

¶42   As the State correctly observes, in this case trial counsel "faced the difficult task of trying to convince the jury that it should have a reasonable doubt about whether Defendant was guilty of sexually abusing [Victim], even though he had confessed to doing so." As previously discussed, Defendant had confessed to the detective that he had sexually abused Victim. *Supra* ¶ 8.

¶43   The record on appeal supports the conclusion that trial counsel's decision not to raise a rule 404(b) objection to Sister's testimony "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Certainly, it was deliberate: counsel stipulated to the admission of the testimony.

¶44   And the record shows that counsel's strategy was to attack Victim's credibility by portraying her testimony as an

extreme fabrication concocted as part of a plot with Mother to get revenge on Defendant for his infidelity and his decision to seek a divorce. Trial counsel was able to use Sister's testimony to further that strategy by suggesting that Mother had enlisted both Victim and Sister in her revenge plot.

¶45    Trial counsel previewed this strategy during his opening statement. For example, he highlighted that "these allegations came out when . . . a divorce was pending." And he asserted that "[t]his case is about revenge and retaliation and [a] money grab." Trial counsel told the jury that it would hear evidence that before Defendant and Mother were married, Defendant "had been awarded an annuity from an accident" and that "after these allegations came out, it was [Mother's] plot to seize everything from him" and that Mother had said "that she's going to take all of his money, all of his annuity for her."

¶46    Trial counsel explained that the jury would hear "allegations from [Sister] and . . . how extreme they are." He stated that while Sister would testify that Defendant had "tied her up with a belt, her hands, and she flailed and screamed constantly to get him to stop," there was "no physical evidence whatsoever. No bruising, no nothing and no explanation, no logical explanation why this abuse, if it happened, was never being reported." Trial counsel further stated:

> You will hear that [Victim] had been going to counseling for years, to various different counselors, people who are trained to help her to get these kinds of allegations out, but yet, none have ever come out.
>
> You will hear that these girls' behaviors were never different. They acted the same before, [during] and after, happy children. Impossible for them to behave in that way if the abuse they allege was taking place.

> You'll hear all of this and at times, it's going to be confusing and at times, we're going to point out all inconsistencies of these girls [and] we point out inconsistencies because inconsistencies show the difference between a real memory and a fabricated memory.

¶47 Trial counsel then elicited testimony to support this theory. To begin with, trial counsel highlighted many of the inconsistencies between Victim's preliminary-hearing testimony and her trial testimony. For example, while Victim testified on direct examination at trial that Mother was the first person she had told about Defendant's abuse, trial counsel elicited testimony from Victim that at the preliminary hearing, Victim had stated that the first person she had told about Defendant's abuse was a friend. Trial counsel highlighted other inconsistencies in Victim's testimony, including (1) the fact that Victim had contradicted herself regarding the timeframe of Defendant's abuse, (2) the fact that, at the preliminary hearing, Victim had failed to "say anything about [Defendant] licking [her] or putting his mouth on [her] vagina," (3) the fact that Victim had never mentioned until trial that Defendant "ejaculated inside of [her] and [she] had to go sit on the toilet . . . to get it out," and (4) Victim's contradictions regarding the time of day Defendant abused her. Trial counsel also elicited testimony from Victim that she had "maintained good grades from 2011 until now." Victim testified that she was upset when Defendant left and that "prior to that time, despite what [she] said he was doing to [her], [she] was still close to him."

¶48 Trial counsel also highlighted inconsistencies in Sister's testimony. For example, contrary to Sister's trial testimony, during the preliminary hearing, Sister had denied that Defendant had ever "struck [her] while the incidents were taking place." Sister also testified that during and after the alleged abuse, she had maintained good grades, participated in extracurricular activities, and held a job. She testified that "when

[Victim] first reported this, [her] mother asked [her] if [Defendant] had been abusing her," and Sister "told her no." Sister also failed to disclose the alleged abuse when police asked her for a written statement, even though the witness statement form had "a disclaimer that tells people to make sure they fill that out honestly" and "if they fill it out and it's not honest, they could be charged with a crime."

¶49    Trial counsel elicited testimony from Mother that she was suicidal after Defendant left her because Defendant "was supposed to be [her] eternal spouse." Mother admitted that after Defendant moved in with his new girlfriend, she went to their house and confronted Defendant and pushed him. Mother described Victim as a "social butterfly" and stated that both Victim and Sister were "[a]s normal as teenagers can be." Mother also testified that Victim and Defendant had a "closer relationship" than Sister and Defendant, and that Sister and Defendant "butted heads." Lastly, Defendant's mother testified that Mother had threatened that "she was going to see that she got [Defendant's] annuity for her girls."

¶50    In closing argument, trial counsel reiterated the theme that Victim's and Sister's claims were fabricated. Trial counsel observed that, "the whole time[,] these girls were living a normal life"; that they continued to be involved in extracurricular activities; and that "[t]heir behavior around [Defendant] in front of everyone was consistent." Trial counsel highlighted the inconsistencies in Victim's and Sister's testimonies and asserted that when traumatic events like the ones Victim and Sister claimed occur, "memories form and you can recall them." Trial counsel asserted:

> Ask yourself, can anyone have this kind of suffering, as much as they claim and continue living a normal life? Why would anyone want to sit on [Defendant's] lap or go places with him? Why would anyone be social? If you were traumatized

like these girls claim by that man, you would not be social, you would not be near him, you would not want anything to do with men, period. You would have major issues in your life and you would not have good grades, but yet, none of that is the case here.[8]

Trial counsel observed that none of the counselors that Victim had seen over the years suspected that "there was ongoing abuse" and that Mother had described Victim as "a social butterfly." Trial counsel further argued:

Are they saying these things because they're [mad] that [Defendant] left them, the person they thought was their father and they're mad at him when he left them and ruined their life[;] for once, they had stability in their life and he—he left them?

---

8. We would note that victimization manifests in many different ways.

According to the literature on the subject, there is no one classical or typical personality profile for abused children. The difficulty with identifying a set of behaviors exhibited by abused children is that abused children react in a myriad of ways that may not only be dissimilar from other sexually abused children, but may be the very same behaviors as children exhibit who are not abused.

*Commonwealth v. Dunkle*, 602 A.2d 830, 832 (Pa. 1992). "'It is impossible to make a general statement about the effects of sexual abuse on children. Children react differently to different situations depending on a number of variables that may be operating at the time of the occurrence.'" *Id.* at 832 n.3 (quoting Alvin A. Rosenfeld, *The Clinical Management of Incest and Sexual Abuse of Children*, 22 Trauma 2, 3 (Oct. 1980)).

> Or are they saying it because they want part of his annuity? We heard testimony that the mom said, I'm going to get his annuity. She's not entitled to it unless he gets convicted and then [she] says that my daughters suffered extreme emotional distress and need money to compensate for their damages. What's going on here?

Trial counsel also highlighted Mother's anger toward Defendant and reminded the jury that Mother had once attacked Defendant and contemplated suicide when she found out Defendant was leaving her.

¶51   Regarding Sister specifically, trial counsel highlighted "how extreme" and "how violent" her allegations were and reminded the jury of the fact that, "when first asked if there had been anything inappropriate," Sister had said no, but then "three weeks later, all of a sudden comes forward with these very serious allegations of being tied down and beaten, of being brutally raped." He also highlighted that Sister had not told the pediatric nurse "about pain, nothing about bleeding."

¶52   Trial counsel ended his closing argument by stating, "[W]hen you look at the big picture, all of the inconsistencies, I'm going to ask you to find [Defendant] not guilty, because when everything is said and done, your story stays the same when it's a real memory and your story changes because you can't remember the lies you made up."

¶53   Based on the foregoing, we conclude that trial counsel's decision not to object to Sister's testimony was supported by a reasonable trial strategy—to persuade the jury that both Victim's and Sister's allegations of abuse were fabricated. Trial counsel highlighted inconsistencies in each girl's testimony and elicited testimony that they both acted normally, maintained good grades, and participated in extracurricular activities during and after Defendant's alleged abuse. Trial counsel emphasized the fact that the girls only reported the abuse after Mother's and

Defendant's divorce was pending and that they could have been motivated to allege abuse because they were "[mad] that [Defendant] left them" or "because they want[ed] part of his annuity." And trial counsel used Sister's testimony, specifically the timing and extreme nature of her allegations, to further the defense's theory that this case was "about revenge." In sum, we conclude that the record indicates that trial counsel chose to refrain from objecting to Sister's testimony so that he could use her testimony to support the defense's overall theory of fabrication.

¶54 Trial counsel's choice to use Sister's testimony as part of the defense's trial strategy did not constitute ineffective assistance of counsel in light of the other evidence. *See State v. Ott*, 2010 UT 1, ¶ 34, 247 P.3d 344. As previously discussed, Defendant confessed to sexually abusing Victim. During his videotaped interview with the detective, Defendant admitted that he had "touched [Victim's] private areas with [his] hands and with [his] privates" "[t]wo or three" times. Although Defendant argues on appeal that this admission "was somewhat ambiguous and allowed for multiple interpretations,"[9] Defendant was given an opportunity on cross-examination to clarify his interview statement. Specifically, the prosecutor asked Defendant to confirm that he had said that he "touched [Victim's] private parts with [his] hands and penis," and Defendant replied, "That was what was on the video, yes." While Defendant's testimony was not an unequivocal admission of guilt, Defendant was given an opportunity to clarify his statement and instead chose to accept the prosecutor's interpretation of his words. In addition, as previously recounted, Victim testified in great detail about Defendant's abuse. *Supra* ¶¶ 11–14.

---

9. Defendant does not elaborate as to what these "multiple interpretations" are.

¶55    Given the totality of the evidence, including Defendant's confession and Victim's detailed testimony, pursuing a fabrication defense was a reasonable trial strategy. And the fact that trial counsel's strategy evidently "did not produce the expected result does not constitute ineffectiveness of counsel." *See Ott*, 2010 UT 1, ¶ 34 (citation and internal quotation marks omitted). We therefore conclude that trial counsel's decision not to object to Sister's testimony "falls within the wide range of reasonable professional assistance," *see Strickland v. Washington*, 466 U.S. 668, 689 (1984), and that trial counsel did not perform deficiently by pursuing this strategy instead of attempting to have Sister's testimony excluded. Consequently, Defendant's ineffective assistance of counsel claim fails.

B.    Plain Error

¶56    Defendant also contends that "[i]t was plain error for the court to admit evidence of uncharged crimes."

¶57    "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the [trial] court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194; *accord State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). An error is prejudicial when "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Dunn*, 850 P.2d at 1208–09.

¶58    Even assuming that the admission of the rule 404(b) evidence—Sister's testimony—was both erroneous and harmful, trial counsel invited any error by stipulating before trial "that [the rule 404(b)] evidence will be reciprocal in each case. [E]ach victim will testify in the other victim's case." "The doctrine of invited error prohibits a party from setting up an error at trial and then complaining of it on appeal." *State v. Redding*, 2007 UT App 350, ¶ 24, 172 P.3d 319 (citation and internal quotation marks omitted). "Under the doctrine of invited error, we have declined to engage in even plain error review when counsel,

either by statement or act, affirmatively represented to the trial court that he or she had no objection to the action taken." *Id.* (brackets, citation, and internal quotation marks omitted). Here, based on trial counsel's stipulation, there was simply no reason for the trial court to sua sponte strike the rule 404(b) evidence.

¶59     Moreover, a trial court is "not required to constantly survey or second-guess a nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (brackets, citation, and internal quotation marks omitted). Consequently, where "defense counsel was not ineffective for failing to object to the State's use of the [rule] 404(b) evidence, there was no plain error on the part of the district court in not intervening to foreclose the State's use of the evidence." *Id.* "Plain error does not exist when a conceivable strategic purpose exists to support the use of the evidence." *Id.* (citation and internal quotation marks omitted).

¶60     In light of counsel's pretrial stipulation that Sister would testify at trial, we conclude that the trial court did not plainly err in admitting Sister's testimony.

## II. Prosecutorial Misconduct

¶61     Defendant next contends that "[t]he prosecutor engaged in misconduct by improperly injecting religious issues into the case, by arguing facts not in evidence, by expressing his own personal opinion, and by disparaging [Defendant]." More specifically, Defendant contends that the prosecutor engaged in misconduct by (1) "expressing his personal opinion and disparaging [Defendant]," (2) arguing facts not in evidence, (3) "inappropriately injecting religious issues into the trial," (4) "inappropriately attack[ing] [Defendant's] credibility by introducing evidence that he was not 'worthy,'" and (5) "attempt[ing] to inappropriately align himself with the victim

and her family by stating to the jury in argument that he had previously served a mission for his church."

¶62 Because Defendant's claims of prosecutorial misconduct were not preserved, he relies on two exceptions to the preservation rule: plain error and ineffective assistance of counsel. *See generally State v. Pedersen*, 2010 UT App 38, ¶ 11, 227 P.3d 1264 ("Claims of prosecutorial misconduct are subject to the preservation rule."). "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the [trial] court." *State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194; *accord State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993) (observing that an error is harmful if, "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined"). To establish ineffective assistance of counsel, an appellant must demonstrate that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

¶63 In the past, when evaluating unpreserved claims of prosecutorial misconduct, we would "consider whether the remarks called the jurors' attention to matters which they would not be justified in considering in reaching a verdict and, if so, whether the remarks were harmless beyond a reasonable doubt." *State v. Redcap*, 2014 UT App 10, ¶ 32, 318 P.3d 1202; *see also State v. Davis*, 2013 UT App 228, ¶¶ 8–9, 12, 18, 311 P.3d 538 (applying the harmless-beyond-a-reasonable-doubt standard to an unpreserved prosecutorial misconduct claim where "the

choice of prejudice standard [was] not outcome determinative"). In other words, we considered whether the prosecutor's statement was improper and whether there was a reasonable possibility that the statement might have contributed to the jury's verdict. However, in *State v. Bond*, 2015 UT 88, 361 P.3d 104, our supreme court clarified that "unpreserved federal constitutional claims are not subject to a heightened review standard but are to be reviewed under our plain error doctrine." *Id.* ¶ 44. And in *State v. Hummel*, 2017 UT 19, 393 P.3d 314, our supreme court further clarified that "our plain error analysis asks not whether *the prosecutor* made a misstep that could be characterized as *misconduct*, but whether the *trial court* made an 'obvious' error in its decision." *Id.* ¶ 105; *see also id.* ¶ 107 ("[P]lain error review considers the plainness or obviousness of the district court's error (not the prosecutor's)."). But "[t]hat is not to say that the extent of a prosecutor's 'misconduct' is irrelevant to our analysis." *Id.* ¶ 108. Indeed, "[i]f a prosecutor asks a question aimed at eliciting material that is both highly prejudicial and clearly inadmissible, that may suggest that the trial judge was plainly wrong in not intervening to block its admission *sua sponte*." *Id.* "The more plain or obvious the prosecutor's misstep, the greater likelihood (other things being equal) that an appellate court would find plain error in a judge's failure to step in to stop it." *Id.*

¶64 A remark is improper when it falls outside the scope of the prosecutor's proper role. "A prosecutor has the duty and right to argue the case based on the total picture shown by the evidence or the lack thereof[.]" *Davis*, 2013 UT App 228, ¶ 19 (citation and internal quotation marks omitted). "And in closing, counsel has considerable latitude to argue his or her view of the evidence and the inferences and deductions arising therefrom." *Id.* (citation and internal quotation marks omitted). "Nevertheless, a prosecutor may not argue a case based on facts not admitted into evidence." *Id.* Prejudice exists when, absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant. *Bond*, 2015 UT 88, ¶ 49.

A.     The Prosecutor's Personal Opinion

¶65     Defendant first contends that "[t]he prosecutor engaged in misconduct by expressing his personal opinion and disparaging [Defendant]." According to Defendant, the prosecutor "explicitly injected his own personal opinion" when he stated in closing, "It doesn't happen when you spoon and grind—and I know those are horrible words, those are his words, that's what he said [Victim] did to him, *I think that's despicable*. But he has no explanation for that part." (Emphasis added.)

¶66     "[A] prosecutor engages in misconduct when he or she expresses personal opinion or asserts personal knowledge of the facts." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799. Here, the prosecutor's comment was clearly a statement of personal opinion, and we therefore agree with Defendant that it was improper and should not have been made. However, "[w]hen we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is 'not whether the prosecutor's comments were proper, but *whether they were so improper* that counsel's only defensible choice was to interrupt those comments with an objection.'" *State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 (quoting *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994)).

¶67     The State observes that one reason "counsel can reasonably decide not to object to 'improper' closing argument is to avoid 'emphasiz[ing] the negative aspects of the case to the jury.'" (Alteration in original) (Quoting *West Valley City v. Rislow*, 736 P.2d 637, 638 (Utah Ct. App. 1987)). According to the State, "Defendant's case presents a prime example of an opportunity to employ that strategy" because the prosecutor "made the challenged remarks in the context of reminding the jury that Defendant had no explanation for his admission that he touched [Victim's] vagina with his penis." But this is inaccurate. The prosecutor was in fact describing his opinion of Defendant's

claim that Victim had been "spoon[ing]" with or "grind[ing]" against Defendant.[10] Raising an objection would not have risked emphasizing Defendant's lack of an explanation, because the comment was so clearly an improper statement of opinion that little or no discussion would have been necessary.

¶68   Nevertheless, we conclude that, even if the trial court erred by failing to intervene when the prosecutor made the improper comment, the error did not harm Defendant; i.e., absent the prosecutor's comment, there is no reasonable likelihood of a more favorable outcome for Defendant. *See State v. Bond*, 2015 UT 88, ¶¶ 44, 49, 361 P.3d 104. In considering whether the prosecutor's comment was harmful, we may consider

> the strength of the evidence against [the defendant], when and under what circumstances the statement was made, whether defense counsel had an opportunity to respond to the improper statement, the purpose of the statement and its effect on the issues in the case, and whether the trial court gave a curative instruction.

*State v. Kozlov*, 2012 UT App 114, ¶ 43, 276 P.3d 1207 (citation and additional internal quotation marks omitted).[11] Here, the prosecutor's statement was made during rebuttal argument so

---

10. Defendant characterizes the prosecutor's remark as "personally disparag[ing] the defendant as 'despicable.'" However, as noted, the prosecutor was (improperly) describing his opinion of Defendant's claim, not Defendant personally.

11. We recognize that *State v. Kozlov*, 2012 UT App 114, 276 P.3d 1207, analyzed an unpreserved prosecutorial misconduct claim under the now-rejected harmless-beyond-a-reasonable-doubt standard; however, the considerations set forth in *Kozlov* remain helpful in reviewing for prejudice in plain-error cases.

defense counsel had no opportunity to respond to it, and the trial court did not give a curative instruction. On the other hand, there was extensive evidence against Defendant, including his videotaped confession and the detailed testimony from Victim; the improper statement was brief, just four words out of fifteen pages of rebuttal argument; the statement had little obvious effect on any issue in the case because it was phrased as an opinion; and the court had instructed the jury not to be influenced by "what you think [the lawyers'] opinions might be" and that closing arguments were merely the lawyers' views of the case, not evidence.

¶69    After considering these factors, we conclude that Defendant has failed to demonstrate that he suffered prejudice from the prosecutor's improper statement. *See Bond*, 2015 UT 88, ¶¶ 44, 49. Our confidence in the jury's verdict is therefore not undermined. *See id.* ¶ 57; *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). And because ineffective assistance of counsel and plain error share a common standard of prejudice, *State v. Redcap*, 2014 UT App 10, ¶ 50, 318 P.3d 1202, and Defendant has not established prejudice under the latter, it follows that he has not established prejudice under the former. Consequently, we reject Defendant's claims regarding the prosecutor's improper statement of opinion.

B.    Facts Not in Evidence

¶70    Defendant next contends that "[t]he prosecutor engaged in misconduct by arguing facts not in evidence." More specifically, Defendant asserts that during closing argument, "the prosecutor twice incorrectly attributed to [Defendant] statements from the video which were in fact not a part of the video interview."

¶71    During closing argument, the prosecutor stated:

> [D]efendant's own statement in his video was, . . . I put my penis, I touched her with my penis on more than one occasion.
>
> . . . .
>
> [Defendant] sat right there on that video and said, in his own words, I touched her in her private areas with my hands and my penis.

Although the prosecutor used the word "penis," Defendant, in his videotaped interview, had used a euphemism: "I touched her private areas with my hands and with my privates."

¶72    Because defense counsel did not object to the prosecutor's characterization of the evidence, Defendant claims ineffective assistance of counsel and plain error. With regard to ineffective assistance of counsel, we must first determine whether counsel's failure to object "fell below an objective standard" of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To do so, we must determine whether an objection to the prosecutor's statement would have been fruitful. *See Redcap*, 2014 UT App 10, ¶ 44 ("The Sixth Amendment does not require counsel to make futile objections." (citation and internal quotation marks omitted)).

¶73    "[A] prosecutor may draw permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799. In addition, a prosecutor "may fully discuss with the jury reasonable inferences and deductions drawn from the evidence." *Id.* ¶ 59.

¶74    It is unclear which of the discrepancies between the prosecutor's version and the videotape animates Defendant's challenge. The State declares, "Presumably, he asserts that these statements were improper because he admitted to touching

[Victim] with his 'privates' and did not use the word penis." Defendant does not dispute this reading of his challenge.

¶75    It is true that by saying "penis" rather than "privates" the prosecutor misquoted Defendant. But Defendant does not deny that his statement referred to his penis. Indeed, Defendant testified that "privates" meant "penis." A prosecutor is entitled to fully discuss reasonable inferences drawn from the evidence. *Bakalov*, 1999 UT 45, ¶ 59. Here, the prosecutor drew not just a reasonable inference but the only reasonable inference from Defendant's statement. Accordingly, we see no impropriety in the prosecutor's statement.

¶76    Because the prosecutor's statement was proper, an objection to it would have been futile. "Failure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Defendant has therefore failed to show that his trial counsel's decision not to raise this objection amounted to ineffective assistance of counsel. And because the statement was proper, there was no plain error that the court should have been aware of. *See State v. Waterfield*, 2014 UT App 67, ¶ 18, 322 P.3d 1194.

C.    Religious Matters

¶77    Defendant next contends that "[t]he prosecutor engaged in misconduct by inappropriately injecting religious issues into the trial." Specifically, Defendant asserts that the prosecutor improperly (1) "elicited testimony that [Victim] did not believe that [Defendant] was 'worthy' to go to the LDS temple to have his marriage sealed," (2) elicited testimony regarding "the religious concept of an 'eternal'" or "forever family," and (3) referred to "the issue of a 'forever family'" in closing argument. We note that it does not appear that the prosecutor tried to elicit testimony regarding religion; rather, the prosecutor was attempting to shed light on the circumstances leading to the disclosure of Victim's allegations.

¶78 Defendant states that "[a] reasonably diligent search of Utah case law has revealed no cases similar to the present one where a court has approved of a prosecutor's conduct in eliciting evidence regarding the spiritual 'worthiness' of a defendant to participate in an LDS temple marriage sealing or has approved a prosecutor's argument that the defendant's conduct destroyed the victim's 'forever family.'" On the other hand, Defendant does not cite any cases where a court has disapproved of such comments. The State also acknowledges that it could not locate a controlling case "addressing the admissibility of testimony and evidence about these or similar religious issues."

¶79 "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the [trial] court." *Waterfield*, 2014 UT App 67, ¶ 18. "To establish that the error should have been obvious to the trial court, the appellant must show that the law governing the error was clear at the time the alleged error was made." *State v. Davis*, 2013 UT App 228, ¶ 32, 311 P.3d 538 (brackets, citation, and internal quotation marks omitted). "Thus, an error is not obvious if there is no settled appellate law to guide the trial court." *Id.* (citation and internal quotation marks omitted).

¶80 Defendant quotes *Bennett v. Angelone*, 92 F.3d 1336 (4th Cir. 1996): "[f]ederal and state courts have universally condemned . . . religiously charged arguments as confusing, unnecessary, and inflammatory." *Id.* at 1346. But *Bennett* involved both counsel making arguments based on biblical events. *Id.* at 1346. Similarly, the cases *Bennett* described were ones in which prosecutors compared a defendant to Judas Iscariot, *Cunningham v. Zant*, 928 F.2d 1006, 1019–20 (11th Cir. 1991), compared a defendant's statement to Peter's denial of Christ, *United States v. Giry*, 818 F.2d 120, 132–33 (1st Cir. 1987), or used biblical allusions to advocate for a death sentence, *Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa. 1991). Defendant also refers us to *State v. Ceballos*, 832 A.2d 14 (Conn. 2003), for the proposition that a majority of jurisdictions "have

concluded that prosecutorial use of religious references is always improper."[12] *Id.* at 32.

¶81 None of the cases underlying *Bennett* or *Ceballos* address the type of facts found here, where the prosecutor elicited testimony from a victim about the circumstances that led her to report the abuse at issue and such circumstances happened to be of a religious character. For example, the prosecutor did not use any explicitly religious references in closing arguments and did not advocate for a result based on religion. And Victim's testimony regarding Defendant's "worthiness" and the temple sealing ceremony did not advance a religious basis for a verdict.

¶82 Counsel are permitted to argue the facts of the case in closing. No rule bars counsel from discussing those facts simply because they may touch on religious belief. For example, *State v. Scieszka*, 897 P.2d 1224 (Utah Ct. App. 1995), involved a Bible study class teacher who "used his faith and his religious position" to entice a fourteen-year-old girl to submit to his acts of sodomy. *Id.* at 1225, 1228. Similarly, in *State v. Flores*, 2015 UT App 88, 348 P.3d 361, the events of the case took place within a church context—in fact, the defendant was the victim's LDS branch president at the time he perpetrated the sexual abuse. *Id.* ¶ 2. Under the rule Defendant proposes, a prosecutor could not elicit the facts of the charged offenses or discuss them in closing.

¶83 Because there is no settled appellate law prohibiting witnesses from mentioning their religious beliefs, Defendant

---

12. The *Ceballos* court continued, however, "These courts . . . do not concomitantly conclude that all improper religious remarks constitute harmful or reversible error." *State v. Ceballos*, 832 A.2d 14, 32 (Conn. 2003). "Rather, the majority approach follows the initial determination of impropriety with a subsequent analysis as to whether the defendant was prejudiced by the inappropriate remarks." *Id.*

cannot establish the existence of an error that should have been obvious to the trial court; consequently, relief is not available via the plain error doctrine. *See Davis*, 2013 UT App 228, ¶ 32.

¶84   Nor is there a basis for concluding that Defendant's counsel was ineffective for failing to object to Victim's testimony. Due to the wide range of legitimate defense strategies, *see Strickland v. Washington*, 466 U.S. 668, 688–89 (1984), a defendant claiming ineffective assistance of counsel must "persuad[e] the court that there was *no conceivable tactical basis* for counsel's actions," *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (citation and internal quotation marks omitted). Here, trial counsel may reasonably have elected not to raise a questionable challenge to a victim's testimony referencing religion to avoid antagonizing jury members who shared that religion.

¶85   Defendant also contends that "[t]he prosecutor attempted to inappropriately align himself with [Victim] and her family by stating to the jury in argument that he had previously served a mission for his church."[13] The State responds that the prosecutor's statement "was not objectionable . . . because it was not intended as a religious reference, but rather as a fair reply to a point in defense counsel's argument." We agree with the State.

¶86   During closing argument, trial counsel highlighted the inconsistencies in Victim's and Sister's testimonies and argued that "when we have a real memory, when our brain actually experiences something, you have a picture in your brain and memories form and you can recall them. . . . When . . . traumatic events [occur], certain events, child birth, weddings, you remember things." Counsel then gave a personal example:

> In 1991, I was a second lieutenant in the
> United States Marine Corps and I was training to

---

13. It appears that Victim, her family, the prosecutor, and Defendant all share the same religious affiliation.

get ready to go to Desert Storm and we thought we were going to war. And I remember, we were in the mess hall, eating dinner, it was about . . . 6:13 at night, and they announced: Bombs just dropped in Baghdad, we're at war.

And I remember specifically, I was having zee burgers, that's our cheese burgers, we called them zee burger, 'cause when you ate them, they made you sleepy . . . .

Well, everybody got up or . . . left their meal and everyone ran out and I remember I was one of the . . . last people there still eating. I remember that 24 years later because that was a huge thing at the time.

¶87    In response, during his rebuttal argument, the prosecutor recounted two events in his own life. He compared these events, asserting that while some traumatic events may be recalled vividly decades later, detailed memories of others fade quickly:

[Trial counsel] talks about what happened in 1991. I wasn't in the military. I was on a mission for my church in 1991 and I remember being in [Portsmouth], New Hampshire, walking down the street and seeing a news stand and looking in there and it says, United States goes to war. I thought, holy cow, we're at war. I was about ready to come home from my mission and . . . I remember talking to my dad and my dad saying, Son, you'd better get in college when you get home or they're going to draft you. I said dad, I'm not worried about that, I think the war's going to be over before I get home. . . .

But I also have a little girl, she's seven years old now. When she was four years old, we rushed

her to the hospital because she started having seizures and her eyes rolled back in her head and she had a hard time breathing and we rushed her to the hospital. A traumatic experience, only three years ago, and I will tell you today, I don't know which car we took, I couldn't tell you who the doctor was, I couldn't tell you a lot of things about that experience to this day and I was a full-grown adult[.] [B]ut a traumatic experience does affect your memory and you don't remember everything. . . .

So this whole idea that when you go through a traumatic experience that you remember everything is poppycock. That's just baloney. . . .

The prosecutor concluded with, "[W]e don't remember everything . . . especially when it's a traumatic experience."

¶88    "Because closing arguments are not evidentiary in nature, trial counsel has wide latitude in closing arguments and is permitted to comment on the evidence already introduced and to argue reasonable inferences therefrom." *State v. Redcap*, 2014 UT App 10, ¶ 32, 318 P.3d 1202 (citation and internal quotation marks omitted). "In determining whether a prosecutor's comments amount to plain error," such that it should have been obvious to the trial court, "'we will consider the comments both in context of the arguments advanced by both sides as well as in context of all the evidence.'" *Id.* ¶ 38 (quoting *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799). "'It is well settled that prejudicial error does not result from . . . improper remarks made during closing argument when such remarks were provoked by the opposing counsel.'" *Id.* (omission in original) (quoting *United States v. Schwartz*, 655 F.2d 140, 142 (8th Cir. 1981)). "The 'doctrine of fair reply' allows a prosecutor to make a 'counteracting statement' after 'defense counsel [opens] the door

on the issue.'" *Id.* ¶ 38 (alteration in original) (quoting *Schwartz*, 655 F.2d at 142).

¶89    We note that the prosecutor's reference to a mission was not an overt call to the jury to base any of its decisions on religion. *Cf. supra* ¶ 80. But even assuming, without deciding, that the prosecutor's comments would have been objectionable standing alone, they were nevertheless a fair reply to trial counsel's own story. Trial counsel discussed his military service and asserted that he recalled details about a traumatic event that took place over twenty years before trial. The prosecutor responded that, although he had been on a mission rather than in the military, he too recalled details about the same event (indicating that his memory abilities were no worse than trial counsel's) but nevertheless could not remember details of a personal traumatic event that occurred only three years before trial. When considered within the context of a response to trial counsel's Marine Corps story, we conclude that the prosecutor's comments, including the statement that he was "on a mission for [his] church," fell within the wide latitude afforded in closing arguments to respond to issues raised by the opposing party. *See Redcap*, 2014 UT App 10, ¶¶ 38, 49.

¶90    Because the prosecutor's comments were unobjectionable, the trial court was not obligated to intervene; Defendant therefore cannot demonstrate plain error. *See id.* ¶ 40. For the same reason, trial counsel was not required to challenge those comments; accordingly, Defendant cannot satisfy the deficient-performance element of an ineffective assistance of counsel claim. *See id.*

¶91    Lastly, Defendant contends that the prosecutor engaged in misconduct by "inappropriately attack[ing] [Defendant's] credibility by introducing evidence that he was not 'worthy.'" It is not clear what particular evidence this claim pertains to; our review of the closing argument transcript reveals that neither the word "worthy" nor its variations were employed, and

Defendant merely refers to "the prosecutor's use of religious elements." But as we have explained, Defendant has not shown that a prosecutor's elicitation of testimony that happens to mention religious beliefs in passing is improper. *See supra* ¶ 82.

¶92 To the extent that highlighting such testimony in closing argument shines a light on the defendant's credibility, we note that "[w]hen a prosecutor discusses the credibility of witnesses during closing arguments, the evil to be guarded against is that a juror would consider such statements to be factual testimony from the prosecutor." *Redcap*, 2014 UT App 10, ¶ 37 (omission, citation, and internal quotation marks omitted). In other words, it is not improper for a prosecutor's closing argument to remind a jury of evidence properly adduced during the evidentiary phase of trial and to suggest a reasonable inference based solely on that evidence. Here, after reviewing the transcript of the prosecutor's closing arguments, we see nothing that the jury might have believed was the prosecutor's factual testimony rather than permissible inferences urged by the prosecutor but drawn from testimony properly adduced during the evidentiary phase of the trial.

¶93 We conclude that Defendant cannot establish plain error or ineffective assistance of counsel based on the prosecutor's introduction of evidence "that he was not 'worthy.'"

## III. Cumulative Error

¶94 Finally, Defendant contends that the "cumulative effect of all error[s] undermines confidence in the verdict and requires reversal." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). "In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred." *Id.*

¶95    After considering the circumstances of this case and the resolution of Defendant's other claims on appeal, our confidence that Defendant received a fair trial has not been undermined. We therefore reject Defendant's cumulative error claim.

CONCLUSION

¶96    We conclude that trial counsel was not ineffective for failing to object to the rule 404(b) evidence, i.e., Sister's testimony. And the trial court did not commit plain error in allowing the evidence to be presented. Trial counsel strategically used Sister's testimony as a basis for the defense's theory that Victim had fabricated her allegations against Defendant as part of a revenge plot. In addition, we conclude that trial counsel did not render constitutionally ineffective assistance by failing to object to the prosecutor's various statements, and that the trial court did not plainly err by not intervening sua sponte.

¶97    Affirmed.

_____